SMITH v EMPLOYMENT SECURITY COMMISSION

DOERR v UNIVERSAL ENGINEERING DIVISION, HOUDAILLE INDUSTRIES, INC

Docket Nos. 62991, 63372. Argued March 4, 1980 (Calendar Nos. 4, 5). —Decided February 3, 1981.

REFERENCES FOR POINTS IN HEADNOTES

[1, 7, 16, 19, 25] 76 Am Jur 2d, Unemployment Compensation § 81.
  General principles pertaining to statutory disqualification for unemployment compensation benefits because of strike or labor dispute. 63 ALR3d 88.
[2] 76 Am Jur 2d, Unemployment Compensation §§ 77, 81.
  General principles pertaining to statutory disqualification for unemployment compensation benefits because of strike or labor dispute. 63 ALR3d 88.
  Application of labor dispute disqualification for benefits to locked out employee. 62 ALR3d 437.
  Construction and application of provisions of unemployment compensation or social security acts regarding disqualification for benefits because of labor disputes or strikes. 28 ALR2d 287.
[3, 8, 14] 76 Am Jur 2d, Unemployment Compensation § 78.
  General principles pertaining to statutory disqualification for unemployment compensation benefits because of strike or labor dispute. 63 ALR3d 88.
  Construction and application of provisions of unemployment compensation or social security acts regarding disqualification for benefits because of labor disputes or strikes. 28 ALR2d 287.
[4, 17] 76 Am Jur 2d, Unemployment Compensation § 11.
  General principles pertaining to statutory disqualification for unemployment compensation benefits because of strike or labor dispute. 63 ALR3d 88.
  Construction and application of provisions of unemployment compensation or social security acts regarding disqualification for benefits because of labor disputes or strikes. 28 ALR2d 287.
[5, 10] 2 Am Jur 2d, Administrative Law § 553 et seq.
  76 Am Jur 2d, Unemployment Compensation §§ 8, 94.
[6, 11, 12, 19] 76 Am Jur 2d, Unemployment Compensation § 78.
[9, 13] 76 Am Jur 2d, Unemployment Compensation § 92.
[11] Application of labor dispute disqualification for benefits to locked out employee. 62 ALR3d 437.
[15] 76 Am Jur 2d, Unemployment Compensation § 94.
[16] Application of labor dispute disqualification for benefits to locked out employee. 62 ALR3d 437.

Gary F. Smith and other members of UAW Local No. 212 claimed unemployment benefits for June 23 to July 28, 1975, when they were locked out by their employer, Imerman Screw Products Company, after the employer and the union were unsuccessful in their negotiation of a new collective bargaining agreement. The union offered to return to work until a new contract was ratified, but the employer did not accept the offer and did not reopen the plant until the new contract was ratified. A referee of the Employment Security Commission denied the plaintiffs' claims, finding that their unemployment was due to a labor dispute in progress in which the plaintiffs were directly involved. The Michigan Employment Security Appeal Board, the Macomb Circuit Court, Edward J. Gallagher, J., and the Oakland Circuit Court, James S. Thorburn, J., all affirmed the denial of benefits. The Court of Appeals, Beasley, P.J., and Bronson and N. J. Kaufman, JJ., consolidated the appeals and reversed, holding that the Employment Security Act was not intended to enforce a lockout by denying unemployment benefits to employees who are available to work (Docket Nos. 78-1351, 78-2093). Defendant Imerman Screw Products Company appeals.

Carl Doerr and other members of UAW Local No. 1131 claimed unemployment compensation for June 1 to August 23, 1971, when their employer, Universal Engineering Division of Houdaille Industries, Inc., locked them out of its Frankenmuth plant upon the expiration of the parties' collective bargaining agreement. During the negotiation of a new contract the union had offered to continue working under the terms of the old contract and stated that it did not intend to strike, but the employer did not accept the union's offer and closed the plant until work was resumed after further negotiations. The Employment Security Commission and the Employment Security Appeal Board denied the plaintiffs' claims, finding that their unemployment was due to a labor dispute in progress in which

[18] 76 Am Jur 2d, Unemployment Compensation §§ 13, 93, 94.

[20, 21, 23, 24] 76 Am Jur 2d, Unemployment Compensation §§ 6, 92.

General principles pertaining to statutory disqualification for unemployment compensation benefits because of strike or labor dispute. 63 ALR3d 88.

Construction and application of provisions of unemployment compensation or social security acts regarding disqualification for benefits because of labor disputes or strikes. 28 ALR2d 287.

[28] 76 Am Jur 2d, Unemployment Compensation §§ 5, 6, 93 et seq.

Construction and application of provisions of unemployment compensation or social security acts regarding disqualification for benefits because of labor disputes or strikes. 28 ALR2d 287.

the plaintiffs were directly involved. The Genesee Circuit Court, Philip C. Elliott, J., on rehearing, affirmed the denial of benefits. The Court of Appeals, V. J. Brennan and R. M. Maher, JJ. (Bashara, P.J., dissenting in part), reversed, holding that the unemployment was not due to the labor dispute (Docket No. 78-389). Defendant Universal Engineering appeals. In an opinion by Justice Fitzgerald, joined by Chief Justice Coleman and Justices Kavanagh, Williams, and Ryan, the Supreme Court *held:*

1. The construction of the Employment Security Act which the plaintiffs propose, that a lockout is not a disqualifying labor dispute, is rejected because it would make redundant the clauses of the statute concerning disqualification resulting from a labor dispute, a violation of the basic rule of statutory construction that, if at all possible, no word should be treated as mere surplusage or rendered nugatory. The first sentence of the disqualification provision is composed of two clauses which set forth two discrete types of disqualification. The first disqualification clause applies to labor disputes in the establishment in which a claimant is or was last employed. The second disqualification clause applies when the labor dispute (other than a lockout) occurs in a functionally integrated establishment operated by the same employing unit. It is significant that the Legislature chose to qualify only the second clause by excepting lockouts. First, it indicates that the Legislature understood that a lockout is one form of labor dispute, since otherwise it would have been unnecessary to except lockouts from the second clause. Second, it leads to the conclusion that the Legislature did not intend to exclude lockouts from the first clause. Another provision of the statute states that a claimant is not disqualified for refusing to work in a position which is vacant due directly to "a strike, lockout, or other labor dispute". This phrase shows legislative recognition that the lockout constitutes one form of a labor dispute; it is probative of the Legislature's intention to include lockouts within the labor dispute disqualification of the first clause.

2. The plaintiffs argue that because they were willing to continue working during the negotiations for a new contract they were involuntarily unemployed by the lockouts. The Employment Security Act is intended to provide relief from the hardship caused by involuntary unemployment, and deserves liberal application by the courts. But equally deserving of judicial cognizance are the specific provisions of the statute which reflect the Legislature's compromise concerning the circumstances under which no benefits should be paid. The Legis-

lature has declared that benefits shall not be paid when the unemployment is due to a labor dispute which is in progress in the same establishment. The disqualification provision makes an exception to the general purpose of the act to provide compensation in all cases of involuntary unemployment. Where a statute expresses first a general intent and afterward an inconsistent particular intent, the latter will be taken as an exception from the former and both will stand. The clause concerning disqualification for a labor dispute is a departure from the general idea of relief from involuntary unemployment. The question of voluntariness in such a case is not the test. The case upon which the employees rely is distinguishable and based on a different statute, and the great weight of authority in other jurisdictions is that a lockout is one form of labor dispute. Moreover, the plaintiffs' argument would require the Court to ignore the clear language of the statute and to decide issues of policy which are reserved to the Legislature. Whether such a disqualification ought to be in the act is an argument that should be presented to the Legislature and not the Court.

3. A lockout is one form of "labor dispute" as that term is used in the disqualification provision, and the statute exempts lockouts from the labor dispute disqualification only when the labor dispute occurs in functionally integrated establishments operated by the same employing unit.

4. The next question is whether the unemployment in these cases was due to a labor dispute and, if it was, whether the claimants were directly involved in the labor dispute. The term "labor dispute" means a controversy between employers and employees regarding hours, wages, conditions of employment, or recognition of a bargaining representative. "Controversy" denotes a difference of opinion marked by the expression of opposing views. A lockout, one of the forms of labor dispute, is the withholding by an employer of work from his employees in order to gain a concession from them. It is the employer's counterpart of a strike. It must also be shown that the claimant's unemployment was causally connected to the labor dispute. A claimant is disqualified under this provision if the disqualifying labor dispute is shown to be a substantial contributing cause of the unemployment, but the dispute need not be the sole cause of the unemployment. It is the employers who bear the burden of proving the claimants' disqualification.

5. The employees contend that their unemployment was actually a layoff for economic reasons rather than a lockout, as the employers claim. In *Smith,* the hearing referee was called

upon to determine the issue of credibility. The plaintiffs produced evidence of a disguised layoff while defendant Imerman Screw Products Company produced evidence of a lockout. This is exactly the kind of situation where the Court must defer to the fact finder. The Court's review must accord due deference to administrative expertise and not invade the province of exclusive administrative fact-finding by displacing an agency's choice between two reasonably differing views. The substantial contributing cause of the lockout of the plaintiffs in *Smith,* which was the immediate cause of the unemployment, was a labor dispute. There was evidence that the negotiations had broken down on the eve of the expiration of the collective bargaining agreement, that the employer locked out its employees to obtain a new contract more favorable to it, and that the company had sufficient work to do during the lockout and was in fact losing business to its competitors. There was also evidence to support the plaintiffs' contention of a disguised layoff for economic reasons, but where substantial evidence exists to support both sides and the administrative agency must make a judgment assigning credibility to one side, the Court may not substitute its judgment for that of the agency.

6. In *Doerr,* the hearing referee concluded that the plaintiffs were unemployed due to a labor dispute. However, in reaching that conclusion, the referee stated that a labor dispute exists whenever negotiations are ongoing. This was error; the definition of the term "labor dispute" requires that there be a controversy. Although the referee made additional findings of fact in the matter which support his finding that a labor dispute existed, it is not certain that the error did not affect his decision. The error was compounded by the appeal board when it found that much of the evidence presented for the first time before it was irrelevant or immaterial. The evidence was relevant and material to the claimants' theory that the employer's economic condition was the substantial contributing cause of their unemployment. An employer may not use the failure to reach a collective bargaining agreement as a pretext for claiming that the unemployment of its employees is due to a labor dispute where it would have curtailed operations in any event because of economic conditions. But when economic conditions have only played a part in the decision to use the lockout tactic, *i.e.,* when the labor dispute is the substantial contributing cause of the unemployment, the employees may properly be disqualified. This determination is necessarily a question of fact. If the appeal board did implicitly recognize and decide the question, it has failed to make any findings of fact on it.

Conclusory findings of fact are inadequate because the Court needs to know the path the board has taken through the conflicting evidence presented, the testimony adopted, the standards followed, and the reasoning used to reach its conclusion. Therefore, the matter is remanded to the Employment Security Board of Review, as the successor to the appeal board, for further proceedings. Jurisdiction is retained.

7. In *Smith,* it is clear that one of the purposes of the parties' labor dispute was to obtain a change in the terms and conditions of employment. The argument that the statutory provision concerning direct involvement in a labor dispute requires a voluntary stoppage of work on the part of the employee is contrary to the clear wording of the statute. The plaintiffs are disqualified because they were directly interested in the labor dispute.

8. The claimants in *Smith* contend that, if the disqualification provision of the Employment Security Act is construed to deny them benefits for a lockout at the plant where they were employed but to allow benefits for employees who are unemployed due to a lockout at a functionally integrated establishment, the statutory classification is arbitrary and denies them equal protection of the law. The Supreme Court of the United States has held that an employment security statute does not involve any discernible fundamental interest or affect with particularity any protected class of persons; the test of its constitutionality under the Equal Protection Clause, therefore, is whether the statute has a rational relation to a legitimate state interest. The standard in this state for scrutinizing legislation which is primarily social and economic against a claimed violation of equal protection is also the rational basis test. The plaintiffs must show that the classification is arbitrary and wholly unrelated in a rational way to the objective of the statute.

9. There is a rational basis for the Legislature's treatment of lockouts in relation to unemployment benefits. The policy of the Employment Security Act is not only to provide relief from involuntary unemployment, but also includes the maintenance of the state's neutrality in labor disputes. The Legislature may have determined that the payment of unemployment benefits to locked-out employees would weaken the effectiveness of the lockout as a bargaining tactic, and may have chosen to treat the lockout as the counterpart to the strike. The Legislature also could have rationally distinguished between an employee locked out at his own place of work and one who is unemployed because of a lockout at a functionally integrated establishment.

It is apparent that the Legislature wished to eliminate the weapon which employees previously had in being able to strike a key plant of an employer and thereby force the employer to pay unemployment benefits to laid-off employees at functionally integrated plants. It is not unreasonable to conclude that the Legislature also intended to eliminate the corresponding weapon of employers in using a lockout at one plant to avoid paying unemployment benefits to employees who are laid off at functionally integrated plants. This scheme furthers the policies of the Employment Security Act. Whether or not one agrees with the wisdom of the lines which the Legislature has drawn, it cannot be said that they lack a rational basis. Thus, the Legislature's treatment of lockouts in the disqualification provision does not violate the Equal Protection Clause.

The decisions of the Court of Appeals are reversed. The judgments of the circuit courts in *Smith* are reinstated, and in *Doerr* the matter is remanded to the Employment Security Commission Board of Review for further proceedings, and jurisdiction is retained.

Justice Moody, dissenting, would construe the Employment Security Act in keeping with the legislative purpose to relieve the hardship of involuntary unemployment and the public policy to encourage the peaceful resolution of labor disputes. Employees who are locked out in spite of their willingness to work during negotiations and who do not strike, threaten to strike, picket, or engage in any other concerted economic acts should be entitled to compensation for their unemployment.

1. The words of a statute should not be construed in isolation; they gain their meaning from the context and overall statutory purpose, especially in the case of the Employment Security Act where a declaration of policy has been enacted for use as a guide to interpretation. The act is intended to provide benefits for employees who are unemployed through no fault of their own, who are willing and ready to obtain employment to support themselves and their families, who are genuinely attached to the labor market, and who are unemployed because of conditions over which they have no control. The effect of the Employment Security Act goes beyond the payment of compensation to claimants; benefits are designed to run to the claimants' families and to the benefit of the public generally by keeping money circulating in times of economic insecurity and thereby to provide a buffer against a downward economic spiral.

2. The stated purpose of providing relief from the hardship of involuntary unemployment requires that the Employment Se-

curity Act be liberally construed to achieve its purpose and that disqualification from benefits be narrowly interpreted. Additionally, the employer bears the burden of proving the disqualification. Involuntariness of unemployment is not the sole determinant of the award of unemployment benefits, but the goal of helping those persons who are unemployed through no fault of their own remains the primary purpose of the Employment Security Act. In these cases the employees specifically refrained from using tactics such as a strike, picketing, or a slowdown of work; they showed an attitude of cooperation, not active economic confrontation. The simple rejection of the offers made by the employers in these cases are qualitatively far different from the more aggressive acts at issue in prior cases. The Court should not endorse a further departure from the legislative policy of providing relief from the hardship of involuntary unemployment. To do so will affect the labor relations strategies of the parties involved and may encourage employers to use the lock-out tactic rather than to continue peaceful negotiations for a solution of the labor dispute.

3. Although a lockout fits within the literal definition of "a labor dispute in active progress", the phrase should not be given a broad construction which is inconsistent with the purpose of the Employment Security Act. Because the statute is not clearly drafted it is difficult to discern the legislative intent from the words alone. The maxims of legislative construction should serve as a guide to interpretation, rather than dictate a result. Where an exclusion is made in a remedial statute the Legislature should make its intent clear, and courts should not disqualify claimants who are not expressly excluded by the Legislature. If the Legislature had contemplated the Court's construction of the statute, it might have added the phrase "including a lockout" when referring to labor disputes in the claimant's establishment to make it parallel to the phrase "other than a lockout" referring to disputes in a functionally integrated establishment.

4. The express exception for lockouts in other establishments does not compel the conclusion that the Legislature intended that any lockout in the establishment in which the claimant is employed would disqualify him from benefits, without regard to the genesis of the lockout. The Legislature simply intended that no claimant would be disqualified because of a lockout at a plant other than that at which he is employed whatever the circumstances of that lockout. As to lockouts in the establishment in which the claimant is employed, in a labor dispute where, for example, the employees are no longer willing to

bargain, or where ultimatums are delivered or concessions demanded as a condition of continuing work, or a strike or a slowdown is threatened, and a lockout results, employees are disqualified from receiving unemployment compensation benefits under the statute. Where an employer locks out employees who are willing to work and to continue peaceful negotiations, however, the employees are not disqualified from benefits.

5. The Court relies on the rule that where a statute expresses first a general intent, and afterwards an *inconsistent* particular intent, the latter will be taken as an exception from the former and both will stand. However, a better approach is to harmonize, if possible, the construction of the term "labor dispute in active progress" with the declared purpose of the Employment Security Act as a whole. Other courts have adopted an "impasse" test which narrows the definition of "labor dispute in active progress"; where the facts show good-faith negotiations between representatives of management and labor and the bargaining is in a fluid state and no impasse has occurred, a disqualifying labor dispute does not exist. Thus, as long as negotiations remain fluid, the employer cannot unilaterally declare a labor dispute to deny the employees unemployment compensation. The impasse test has proven to be a workable and fair rule. It brings the labor dispute disqualification into harmony not only with the declared purpose of the Employment Security Act, but also with the national and state policy of encouraging good-faith collective bargaining as opposed to a resort to economic warfare. And it does not encourage the employer to use denial of unemployment compensation benefits to enforce its bargaining demands. The Court should adopt such a test and remand these cases to the Employment Security Board of Review to determine whether an impasse existed.

6. Even if the Court declines to adopt the impasse test, it should not construe the labor dispute disqualification so broadly as to include these cases. Paying benefits to the claimants would be far more consistent with the purpose of providing relief from unemployment in a manner which avoids encouraging work stoppages than is denying compensation. In both cases, the employees expressed their willingness to work under the terms of the old contract while a new one was being negotiated. Even after they were locked out, the employees in *Smith* did not picket or do anything to interfere with the company's operation of its plants. In *Doerr*, the employees ultimately did return to work under the old contract terms, and worked at full efficiency during the continuing negotia-

tions. Refusal to pay unemployment compensation under these circumstances will discourage such attempts at labor peace.

7. It is not the proper function of this Court to amend the Employment Security Act to broaden or extend the disqualifications fixed by plain language by the Legislature. It is appropriate in these cases to narrow or limit the scope of the disqualification to make it consistent with the act's declared purposes. The Legislature has failed to respond to the decisions by the Court of Appeals awarding benefits in these cases, although, in the past, the Legislature has not hesitated to respond when it has disagreed with a court's interpretation of the Employment Security Act. If the Legislature did disagree with the grant of benefits, it had the opportunity to express that disagreement in 1980 when it enacted major amendments to the statute, but it made only minor stylistic changes in the labor dispute disqualification provision. Therefore, it cannot be summarily concluded that awarding benefits to these claimants would conflict with the legislative intent; if any inconsistency existed it is not likely that the Legislature would have remained silent.

8. The state's policy of maintaining neutrality in labor disputes requires that the unemployment compensation fund not be used to support either side of a labor dispute through the denial or award of benefits. The employers argue that the employees would be unfairly buttressed if benefits were awarded in any lock-out situation. But neutrality also requires that the denial of benefits may not be used to strengthen the position of an employer who has locked out employees who are willing to work. When employees are willing to continue their tasks, without engaging in such economic action as a strike, slowdown, unwarranted absenteeism, or picketing, the Employment Security Act was not intended to help enforce a lockout in the manner of these cases.

Justice Levin did not participate in the decision of these cases.

89 Mich App 212; 280 NW2d 489 (1979) reversed.

90 Mich App 455; 282 NW2d 352 (1979) reversed.

## Opinion of the Court

1. Unemployment Compensation — Disqualification — Labor Dispute — Lockout — Words and Phrases.

A lockout of employees by an employer is one form of labor dispute under the provision of the Employment Security Act concerning disqualification of claimants whose unemployment

is due to a labor dispute in which they are directly involved (MCL 421.29[8]; MSA 17.531[8]).

2. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DIS-
PUTE — LOCKOUT.

Employees who are locked out by their employer due to a labor dispute at their place of employment in which they are directly involved are disqualified for benefits under the Employment Security Act; however, the Legislature intended to exempt lockouts from the disqualification provision for claimants who are unemployed due to a labor dispute at a functionally integrated establishment operated by the same employer (MCL 421.29[8]; MSA 17.531[8]).

3. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DIS-
PUTE — EMPLOYMENT SECURITY ACT — LEGISLATIVE PURPOSE.

The Employment Security Act is intended to provide relief from the hardship caused by involuntary unemployment and its broad legislative purpose deserves liberal application by the courts; however, the provision of the statute concerning disqualification of claimants for involvement in a labor dispute makes an exception to the general purpose of the act, and the question of voluntariness of the unemployment in such a case is not the test (MCL 421.29[8]; MSA 17.531[8]).

4. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DIS-
PUTE — STATUTES — CONSTRUCTION.

The Supreme Court may not ignore the clear language of the Employment Security Act and declare that a claimant is disqualified due to a labor dispute only when the claimant actively engages in the labor dispute by personally refusing to work because to do so would be to decide issues of policy reserved to the Legislature (MCL 421.29[8]; MSA 17.531[8]).

5. UNEMPLOYMENT COMPENSATION — FINDINGS OF FACT — APPEAL.

A court reviewing findings of fact by the Employment Security Commission is limited to a determination whether the findings are supported by competent, material and substantial evidence on the whole record; the court cannot substitute its own judgment for that of the administrative agency if there is substantial evidence which supports findings of the agency (Const 1963, art 6, § 28; MCL 421.38; MSA 17.540).

6. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DIS-
PUTE — WORDS AND PHRASES.

The term "labor dispute" in the disqualification provision of the Employment Security Act means a controversy between em-

ployer and employees regarding hours, wages, conditions of employment, or recognition of a bargaining representative (MCL 421.29[8]; MSA 17.531[8]).

7. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DIS-PUTE — LOCKOUT — WORDS AND PHRASES.

A lockout, which is one form of labor dispute under the disqualification provision of the Employment Security Act, is withholding by an employer of work from its employees in order to gain a concession from them; it is the employer's counterpart of a strike (MCL 421.29[8]; MSA 17.531[8]).

8. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DIS-PUTE.

A claimant is disqualified for unemployment benefits due to a labor dispute if the labor dispute is shown to be a substantial contributing cause of the unemployment; the labor dispute need not be the sole cause of the unemployment (MCL 421.29[8]; MSA 17.531[8]).

9. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — BURDEN OF PROOF.

The employer bears the burden of proving that a claimant is disqualified for unemployment benefits due to a labor dispute (MCL 421.29[8]; MSA 17.531[8]).

10. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DISPUTE — FINDINGS OF FACT.

A finding of fact by a hearing referee of the Employment Security Commission that a lockout by an employer was a bargaining tactic in a labor dispute, rather than a layoff for economic reasons, which was based on conflicting evidence presented by the parties, presents a case where a reviewing court must defer to the fact finder; the court's review of the finding must not invade the province of exclusive administrative fact-finding by displacing the referee's choice between two reasonably differing views of the credibility of the evidence (Const 1963, art 6, § 28; MCL 421.29[8], 421.38; MSA 17.531[8], 17.540).

11. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DISPUTE — LOCKOUT.

The substantial contributing cause of the unemployment of union members claiming unemployment benefits was properly found to be a labor dispute where there was substantial evidence that negotiations between the union and the employer had broken down on the eve of the expiration of the parties' collective bargaining agreement, that the employer locked out its union

employees to obtain a new contract favorable to it, and that the employer had sufficient work to do during the lockout and was, in fact, losing business to its competitors (MCL 421.29[8]; MSA 17.531[8]).

12. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DISPUTE — WORDS AND PHRASES.

The term "labor dispute" requires that there be a controversy; therefore, a conclusion by a hearing referee of the Employment Security Commission that claimants were unemployed due to a labor dispute which was based, in part, on the statement that a labor dispute exists whenever negotiations are ongoing was erroneous (MCL 421.29[8]; MSA 17.531[8]).

13. UNEMPLOYMENT COMPENSATION — EVIDENCE — ADMISSIBILITY — DISQUALIFICATION — LABOR DISPUTE — LAYOFF.

Evidence which union members presented before the Employment Security Commission Appeal Board concerning economic reasons given by their employer for laying off a clerical worker, and the financial and economic reasons for the demands the employer was making in collective bargaining with the union was admissible because it was relevant and material to the theory of the union members that the employer's economic conditions were the substantial contributing cause of their unemployment, rather than the labor dispute between the parties (MCL 421.29[8], 421.35[1], 421.36[3]; MSA 17.531[8], 17.537[1], 17.538[3]).

14. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DISPUTE — LOCKOUT.

An employer may not use failure to reach a collective bargaining agreement as a pretext for claiming that its employees are unemployed due to a labor dispute where it would have curtailed operations in any event because of economic conditions; but where economic conditions have only played a part in the decision to use the lockout tactic, *i.e.,* where the labor dispute is the substantial contributing cause of the unemployment, the employees may properly be disqualified for unemployment benefits (MCL 421.29[8]; MSA 17.531[8]).

15. UNEMPLOYMENT COMPENSATION — FINDINGS OF FACT — RECORD ON APPEAL.

Conclusory findings of fact are inadequate in deciding a claim for unemployment benefits because the Court needs to know the path that the Employment Security Commission Appeal Board has taken through the conflicting evidence, the testimony

adopted, the standards followed, and the reasoning used to reach its conclusion (Const 1963, art 6, § 28; MCL 421.38; MSA 17.540).

16. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DISPUTE — LOCKOUT — DIRECT INTEREST.

Union members who were locked out by their employer after a breakdown in collective bargaining were directly involved in a labor dispute where it was clear that one of the purposes of the lockout was to obtain a change in the terms and conditions of the union members' employment; it is contrary to the clear meaning of the Employment Security Act to argue that a voluntary stoppage of work on the part of the employee is required to disqualify him for unemployment benefits (MCL 421.29[8]; MSA 17.531[8]).

17. UNEMPLOYMENT COMPENSATION — CONSTITUTIONAL LAW — EQUAL PROTECTION.

The Supreme Court of the United States has held that an employment security statute does not involve any discernible fundamental interest or affect with particularity any protected class of persons; the test of the statute's constitutionality under the Equal Protection Clause, therefore, is whether the statute has a rational relation to a legitimate state interest (US Const, Am XIV; MCL 421.1 et seq.; MSA 17.501 et seq.).

18. UNEMPLOYMENT COMPENSATION — CONSTITUTIONAL LAW — EQUAL PROTECTION.

Plaintiffs claiming that a provision of the Employment Security Act which disqualified them for benefits violates the Equal Protection Clause must show that the statutory classification is arbitrary and wholly unrelated in a rational way to the objective of the statute (Const 1963, art 1, § 2; MCL 421.29[8]; MSA 17.531[8]).

19. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DISPUTE — CONSTITUTIONAL LAW — EQUAL PROTECTION.

The provision of the Employment Security Act which disqualifies employees who are locked out by their employer for a labor dispute in which they are directly involved but which does not disqualify locked-out employees where the labor dispute occurs in a functionally integrated establishment operated by the same employer does not violate the Equal Protection Clause; it cannot be said that the Legislature lacked a rational basis in concluding that this statutory scheme preserves the policy of the state's neutrality in labor disputes by maintaining the

effectiveness of the parties' corresponding tactics of lockouts and strikes (US Const, Am XIV; Const 1963, art 1, § 2; MCL 421.29[8]; MSA 17.531[8]).

20. UNEMPLOYMENT COMPENSATION — EMPLOYMENT SECURITY ACT — PUBLIC POLICY.

The public policy of the Employment Security Act includes the maintenance of the state's neutrality in labor disputes (MCL 421.1 *et seq.;* MSA 17.501 *et seq.).*

DISSENTING OPINION BY BLAIR MOODY, JR., J.

21. UNEMPLOYMENT COMPENSATION — EMPLOYMENT SECURITY ACT — LEGISLATIVE PURPOSE.

*The provisions of the Employment Security Act must be read not solely in terms of their literal meaning, but, rather, with the stated statutory purpose of relieving the hardship of involuntary unemployment as a guide to interpretation; unemployment benefits, beyond paying compensation to the claimant, are designed to run to the claimants' families and to the benefit of the public generally by keeping money circulating in times of economic insecurity and thereby to provide a buffer against a downward economic spiral (MCL 421.2; MSA 17.502).*

22. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — EMPLOYMENT SECURITY ACT.

*The stated purpose of providing relief from the hardship of involuntary unemployment requires that the Employment Security Act be liberally construed to achieve its purpose and that disqualification from benefits be narrowly interpreted; additionally, the employer bears the burden of proving the disqualification (MCL 421.29[8]; MSA 17.531[8]).*

23. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DISPUTE — LOCKOUT.

*The Supreme Court should not depart from the policy of the Employment Security Act of providing relief from the hardship of involuntary unemployment by construing the statute to disqualify from unemployment benefits employees who were locked out by their employer where the employees specifically refrained from using tactics such as a strike, picketing, or a slowdown of work; showed an attitude of cooperation, not active economic confrontation; and simply rejected the offers made by their employer for a new collective bargaining agreement, because to do so will affect the labor relations strategies of the parties involved and may encourage employers to use the lock-*

out tactic rather than to continue peaceful negotiations for a solution of the labor dispute (MCL 421.29[8]; MSA 17.531[8]).

24. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DISPUTE — PUBLIC POLICY.

The public policy of the Employment Security Act is not only to relieve the hardships of involuntary unemployment, but to do so in a manner calculated to avoid any encouragement of work stoppages arising out of labor disputes, because it is also the express policy of the state, as codified in the labor mediation act, to encourage the peaceful resolution of labor disputes (MCL 421.2, 423.1; MSA 17.502, 17.454[1]).

25. LABOR RELATIONS — LOCKOUT — WORDS AND PHRASES.

A lockout is one form or manifestation of a labor dispute where an employer withholds work from his employees to gain concessions from them.

26. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DISPUTE — LOCKOUT.

Courts should not disqualify from unemployment benefits claimants not expressly excluded by the Legislature; although a lockout fits within the literal definition, it is not automatically a "labor dispute" under the disqualification provision of the Employment Security Act because the provision is not clearly drafted, and to construe the term broadly to include a lockout would be inconsistent with the remedial purpose of the statute (MCL 421.29[8]; MSA 17.531[8]).

27. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DISPUTE — IMPASSE TEST.

The Supreme Court should adopt the "impasse" test which narrows the definition of "labor dispute in active progress" under the disqualification provision of the Employment Security Act so that where the facts show good-faith negotiations between representatives of management and labor and the bargaining is in a fluid state and no impasse has occurred, a disqualifying labor dispute does not exist; thus, as long as negotiations remain fluid, the employer cannot lock out the employees and unilaterally declare a labor dispute to deny the employees unemployment compensation (MCL 421.29[8]; MSA 17.531[8]).

28. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — LABOR DISPUTE — LOCKOUT — LEGISLATIVE INTENT.

It cannot be summarily concluded that a decision by the Court of Appeals awarding unemployment compensation to claimants

*who were locked out by their employer in spite of their willing-
ness to continue working without a contract during negotia-
tions conflicts with legislative intent where, in the past, the
Legislature has not hesitated to respond when it has disagreed
with a court's interpretation of the Employment Security Act,
and if it did disagree with the Court of Appeals, it had the
opportunity to express that disagreement in 1980 when it
enacted major amendments to the statute, but made only
minor stylistic changes in the labor dispute disqualification
provision (MCL 421.29[8]; MSA 17.531[8]).*

*Roth, Mazey, Mazey & Hamburger, P.C.,* for
plaintiffs in *Smith.*

*Marston, Sachs, Nunn, Kates, Kadushin &
O'Hare, P.C.* (by *Charles Looman),* and *John A.
Fillion, Jordan Rossen* and *M. Jay Whitman* for
plaintiffs in *Doerr.*

*Cox & Hooth, P.C.* (by *Gilbert C. Cox, Jr.,* and
*John L. Cerretani),* for defendant Imerman Screw
Products Company.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by
*James D. Tracy* and *Cameron H. Piggott)* for de-
fendant Universal Engineering Division, Houdaille
Industries, Inc.

Amici Curiae:

*Dickinson, Wright, McKean, Cudlip & Moon* (by
*Lawrence G. Campbell, Richard M. Bolton* and
*Michael B. W. Sinclair)* for Borden, Inc.

*Dreyer & DuBois, P.C.* (by *James D. Dreyer* and
*Michael K. Cooper),* for U.S. Plywood Division,
Champion Building Products.

*Marston, Sachs, Nunn, Kates, Kadushin &
O'Hare, P.C.* (by *Theodore Sachs* and *Charles Loo-
man),* for Michigan State AFL-CIO.

*Clark, Klein & Beaumont* (by *Dwight H. Vincent*
and *J. Walker Henry)* for Michigan Manufacturers
Association, Employers Association of Detroit, Em-
ployers Association of Grand Rapids, Employers
Unemployment Compensation Council, Foundry-
men's Association of Michigan, Independent Insur-
ance Agents of Michigan, Michigan Asphalt Pav-
ing Association, Inc., Michigan Auto Dealers Asso-
ciation, Michigan Automotive Wholesalers Associa-
tion, Michigan Beer & Wine Wholesalers Associa-
tion, Michigan Chapter of Associated General Con-
tractors, Michigan Dairy Foods Association, Michi-
gan Food Dealers Association, Michigan Funeral
Directors Association, Inc., Michigan Independent
Telephone Association, Michigan Institute of
Laundering & Drycleaning, Michigan Licensed
Beverage Association, Michigan Oil & Gas Associa-
tion, Michigan Plumbing & Mechanical Contrac-
tors Association, Inc., Michigan Retail Lumber
Dealers Association, Michigan Retailers Associa-
tion, Michigan Savings & Loan League, Michigan
Tobacco-Candy Distributors & Vendors Associa-
tion, Inc., Michigan Trucking Association, Inc., and
Music Operations of Michigan.

FITZGERALD, J. In both of these cases, the em-
ployer locked out its employees upon the expira-
tion of their collective bargaining agreement after
negotiations to arrive at a new agreement had
been unsuccessful. We granted leave to appeal to
decide whether the employees are entitled to un-
employment compensation where they were locked
out in spite of their willingness to continue work-
ing during contract negotiations. In both cases, the
Michigan Employment Security Commission
(MESC) Referee, the MESC Appeal Board and the
circuit court found for the employer and the Court
of Appeals reversed, finding for the employees.

# I

These cases require us to examine the labor dispute disqualification provision of the Employment Security Act (ESA), MCL 421.29(8); MSA 17.531(8), as it applies to the lockout situation. The statute provides in pertinent part:

"An individual shall be disqualified for benefits for any week with respect to which his total or partial unemployment is due to a labor dispute in active progress, or to shutdown or start-up operations caused by that labor dispute, in the establishment in which he is or was last employed, or to a labor dispute, other than a lockout, in active progress, or to shutdown or start-up operations caused by that labor dispute, in any other establishment within the United States which is functionally integrated with the establishment and is operated by the same employing unit."

A finding of disqualification under the above provision is not the end of the inquiry. The statute further provides that an individual shall not be disqualified unless he is "directly involved" in the dispute. Section 29(8)(a) sets forth four criteria by which the requisite involvement is determined. It is only after both of these findings have been made that a claimant may be disqualified from receiving unemployment benefits under this provision.[1] Thus, in order for appellees in the present cases to be disqualified, it must be shown that their unemployment was due to a labor dispute in which they were directly involved.

# II

Appellees and amicus AFL-CIO argue that the

[1] *Baker v General Motors Corp,* 409 Mich 639; 297 NW2d 387 (1980); *Scott v Budd Co,* 380 Mich 29; 155 NW2d 161 (1968).

type of lockout[2] involved here is not intended to be included within the terms of the statutory labor dispute disqualification. They rely on the general purpose of the statute expressed in MCL 421.2; MSA 17.502, to provide benefits to workers who are involuntarily unemployed. Because appellees were willing to continue working during contract negotiations, appellees claim that they were involuntarily unemployed. Appellees and amicus AFL-CIO, as well as the *Smith* panel in the Court of Appeals, rely heavily on *National Gypsum Co v Administrator, Louisiana Dep't of Employment Security,* 313 So 2d 230 (La, 1975). Finally, appellee Smith argues that the commission, the trial court and appellants have misread § 29(8) by "contending that a disqualification results from their reading of the phrases, 'or to a labor dispute, other than a lockout, in active progress, *or* to shutdown or start-up operations caused by that dispute * * *' as if the [italicized] 'or' was 'and' ".

At the outset, we reject plaintiff Smith's construction of the statute. Such a construction would render the labor dispute clauses redundant. This violates the basic rule of statutory construction that, if at all possible, no word should be treated as mere surplusage or rendered nugatory. *Scott v Budd Co,* 380 Mich 29, 37; 155 NW2d 161 (1968); *Stowers v Wolodzko,* 386 Mich 119, 133; 191 NW2d 355 (1971).

A plain reading of the first sentence of § 29(8) indicates that it is composed of two clauses in which the Legislature sets forth two discrete types of disqualification. The first disqualification applies to labor disputes in the establishment in which a

---

[2] We do not distinguish, as does appellee Doerr, between offensive and defensive lockouts because the Legislature has not chosen to do so. See *Memco v Maryland Employment Security Administration,* 280 Md 536, 546; 375 A2d 1086, 1092-1093 (1977).

claimant is or was last employed. The second disqualification applies when the labor dispute (other than a lockout) occurs in a functionally integrated establishment operated by the same employing unit.[3] In the instant cases we are concerned only with the first disqualification clause.

It is significant that the Legislature chose to qualify the labor dispute disqualification in the second clause by excepting lockouts while it left intact the labor dispute disqualification in the first clause without similar qualification. First, it indicates that the Legislature understood that a lockout is one form of a labor dispute since it would have been unnecessary to include the lockout exception in the second clause had it been otherwise. Second, it leads us to conclude that the Legislature intended to exempt lockouts from the labor dispute disqualification for claimants who are unemployed due to a labor dispute at a functionally integrated establishment, while it did not intend to so exempt claimants who are unemployed due to a labor dispute at an establishment in which they are or were last employed. If the Legislature had intended to exclude lockouts in the first clause, it could have explicitly done so as it did in the second clause.[4]

Further support for our conclusion is provided by § 29(7)(a) of the act which states that an individual shall not be disqualified for benefits for refusing to accept work, "[i]f the position offered is vacant due directly to a strike, lockout, *or other labor dispute*". (Emphasis added.) Numerous other jurisdictions have considered similar provisions in

---

[3] See Lewis, Unemployment Compensation Law in Labor Disputes: Michigan Compared with Seven Selected States 1936-1964 (Kalamazoo: The W. E. Upjohn Institute for Employment Research, 1964); 6 Unemployment Ins Rep (CCH) 25, 255.

[4] *Ibid.*

their unemployment statutes to be a legislative recognition that the lockout constitutes one form of labor dispute.[5]

"Nearly all of the 51 statutes employ the term 'labor dispute' or its equivalent, but only a few attempt any definition or limitation of those words. However, one clue as to meaning has been inserted in every statute in order to satisfy the minimum requirements of the Federal Social Security Act. The state statutes provide without exception that benefits shall not be denied to an otherwise eligible employee if he refuses to accept new work when the position offered is vacant due to a 'strike, lockout, or other labor dispute,' such a job not constituting 'suitable work.' This phrase indicates not only that 'strikes' and 'lockouts' are species within the genus 'labor dispute' but also that a statutory 'labor dispute' may exist in the absence of the strike or lockout manifestations." (Footnotes omitted.)[6]

We agree that the inclusion of such language in our own statute is probative of the Legislature's intention to include lockouts within the labor dispute disqualification.

In response to the argument that we should adhere to the general purpose of the statute, *i.e.,* to provide benefits to individuals involuntarily unemployed, in construing § 29(8) to exclude lockouts because individuals who are locked out are involuntarily unemployed, we refer to *Noblit v The Marmon Group,* 386 Mich 652, 654-655; 194 NW2d 324 (1972):

---

[5] See, *e.g., Adams v Industrial Comm,* 490 SW2d 77 (Mo, 1973); *In the Matter of Usery,* 31 NC App 703; 230 SE2d 585 (1976); *Buchholz v Cummins,* 6 Ill 2d 382; 128 NE2d 900 (1955); *Schoenwiesner v Board of Review,* 44 NJ Super 377; 130 A2d 648 (1957); *In the Matter of North River Logging Co,* 15 Wash 2d 204; 130 P2d 64 (1942); *Henzel v Cameron,* 228 Or 452; 365 P2d 498 (1961); *Nelson v Texas Employment Comm,* 290 SW2d 708 (Tex Civ App, 1956).

[6] Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification,* 17 U Chi L Rev 294, 300 (1950).

"The Employment Security Act is intended to provide relief from the hardship caused by involuntary unemployment. That is the broad legislative purpose. It deserves liberal application by the courts.

"But equally deserving of judicial cognizance and respect are the specifics of the Employment Security Act.

"It would have been simple enough for the Legislature to provide unemployment benefits for all persons involuntarily unemployed.

"The legislative process is more complex than merely a forum in which broad goals are agreed upon. The Employment Security Act is a detailed legislative enactment, embodying the ultimate agreement of the Representatives and Senators upon a scheme of unemployment compensation, and reflecting their compromise of various policy considerations affecting the circumstances under which other policy considerations warranted the conclusion that no benefits should be paid at all.

"The Legislature has declared that benefits shall not be paid when

"'* * * unemployment is due to a labor dispute which was or is in progress in any department or unit or group of workers in the same establishment.' MCL 421.29(8)(a)(iv); MSA 17.531(8)(a)(iv).

* * *

"There is no question that the unemployment of the truck drivers was involuntary. Likewise, there is no question that the involuntary unemployment of the truck drivers was a category of involuntary unemployment which the Legislature has specifically excluded from eligibility for unemployment compensation benefits."

The courts of other states which have been presented with this argument in the lockout context have disposed of it similarly:

"Under a well-established canon of statutory construction, the foregoing section makes an exception to

the generally declared purpose of the act to provide compensation in all cases of involuntary unemployment. *In re Steelman,* 219 NC 306; 13 SE2d 544 (1941). For the rule is that: 'Where a statute expresses first a general intent, and afterwards an inconsistent particular intent, the latter will be taken as an exception from the former and both will stand.' 1 Lewis' Sutherland Statutory Construction (2d ed), § 268, p 513; *Rodgers v United States,* 185 US 83; 22 S Ct 582; 46 L Ed 816 (1902); *Crane v Reeder,* 22 Mich 322 (1871)." *In the Matter of North River Logging Co,* 15 Wash 2d 204, 207-208; 130 P2d 64 (1942). See, also, *Lawrence Baking Co v Unemployment Compensation Comm,* 308 Mich 198; 13 NW2d 260 (1944).

"This labor dispute clause is a departure from the general idea of relief from involuntary unemployment. The question of voluntariness in such a case is not the test." *Buchholz v Cummins,* 6 Ill 2d 382, 386-387; 128 NE2d 900, 903 (1955).[7]

Finally, we find that *National Gypsum Co v Administrator, Louisiana Dep't of Employment Security, supra,* is distinguishable. In that case, the Louisiana court concluded that the labor dispute disqualification in their statute only applied to unemployment resulting from labor disputes in which the employee himself actively engages by refusing to work. First, Louisiana's statutory labor disqualification provision differs from Michigan's in that it does not contain the phrase "labor dispute, other than a lockout". Second, as the court itself recognized, *National Gypsum* is a minority holding. The great weight of authority in other jurisdictions is that a lockout is one form in which a labor dispute may be manifested.[8] We are

[7] See, also, *Adams v Industrial Comm, supra; In the Matter of Usery, supra; In the Matter of North River Logging Co, supra; Nelson v Texas Employment Comm, supra.*

[8] *Barnes v Employment Security Board of Review,* 210 Kan 664; 504 P2d 591 (1972); *Adams v Industrial Comm, supra; In the Matter of Usery, supra; Olusczak v Florida Industrial Comm,* 230 So 2d 31 (Fla

impressed not only with the fact that the majority holds this view, but also by the reasoning upon which the majority is based.

Moreover, we decline to follow *National Gypsum* because it would require us to ignore the clear language of the statute and to decide issues of policy reserved to the Legislature. See *Buzza v Unemployment Compensation Comm,* 330 Mich 223, 236; 47 NW2d 11 (1951); *Lawrence Baking Co v Unemployment Compensation Comm, supra,* pp 212, 215; *Lansing v Lansing Twp,* 356 Mich 641, 648; 97 NW2d 804 (1959).

We hold that a lockout is one form of a "labor dispute" as that term is used in § 29(8). Furthermore, we find that § 29(8) exempts lockouts from the labor dispute disqualification only when the labor dispute occurs in functionally integrated establishments operated by the same employing unit.

### III

Having determined that § 29(8) recognizes a lockout as a type of labor dispute which comes within the disqualification provision applicable here, we must next decide whether the unemployment involved in the cases before us was due to a

---

App, 1970); *Buchholz v Cummins, supra; Sweeny v Board of Review,* 43 NJ 535; 206 A2d 345 (1965); *Schoenwiesner v Board of Review, supra; In re North River Logging Co, supra; Henzel v Cameron, supra; Nelson v Texas Employment Comm, supra; A J Sweet of La Crosse, Inc v Industrial Comm,* 16 Wis 2d 98; 114 NW2d 141, 853 (1962); *Baltimore Typographical Union No 12 v Hearst Corp,* 246 Md 308; 228 A2d 410 (1967) (Maryland enacted a statutory exception for lockouts prior to decision in that case. It is interesting to note that the Court held in that case that application of the exception was prospective only). See, also, Anno: *Unemployment compensation: Application of labor dispute disqualification for benefits to locked out employee,* 62 ALR3d 437; 76 Am Jur 2d, Unemployment Compensation, § 81, p 990; Haggart, *Unemployment Compensation During Labor Disputes,* 37 Neb L J 668 (1958).

labor dispute and, if it was, whether appellees were directly involved in the labor dispute. Our function as a reviewing court is limited to a determination of whether the findings of the MESC are supported by competent, material and substantial evidence on the whole record. MCL 421.38; MSA 17.540. This Court cannot substitute its own judgment for that of the administrative agency if there is substantial evidence which supports the agency. *Michigan Employment Relations Comm v Detroit Symphony Orchestra, Inc,* 393 Mich 116; 223 NW2d 283 (1974); *Regents of the University of Michigan v Employment Relations Comm,* 389 Mich 96; 204 NW2d 218 (1973).

## A

Before we examine the evidence, it is helpful to review certain legal concepts which are relevant here.

The term "labor dispute" has been defined in Michigan as follows:

" 'The term "labor dispute" includes any controversy between employers and employees or their representatives concerning or affecting hours, wages, or working conditions. In the state labor mediation act ([1948 CL 423.2, subd (b); MSA 17.454(2), subd (b)]) it is defined as follows:

" ' "The terms 'dispute' and 'labor dispute' shall include but are not restricted to any controversy between employers and employees or their representatives * * * concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining or changing terms or conditions of employment.' " *Lillard v Employment Security Comm,* 364 Mich 401, 420; 110 NW2d 910 (1961).

"It means no more than a controversy between em-

ployer and employees regarding hours, wages, conditions of employment or recognition of a bargaining representative." *General Motors Corp v Employment Security Comm,* 378 Mich 110, 117; 142 NW2d 686 (1966).[9]

"Controversy" denotes "a difference [of opinion] 'marked by the *expression* of opposing views.'" *Salenius v Employment Security Comm,* 33 Mich App 228, 238; 189 NW2d 764 (1971). (Emphasis added.)

A lockout, one of the forms by which a labor dispute is manifested, has been defined as follows:

"A lockout is an employer's withholding of work from his employees in order to gain a concession from them. It is the employer's counterpart of a strike." 4 Restatement Torts, § 787, Comment a, p 128.

In addition to establishing the existence of a labor dispute, it must be shown that the claimant's unemployment was causally connected to the labor dispute. *Michigan Tool Co v Employment Security Comm,* 346 Mich 673; 78 NW2d 571 (1956); *Scott v Budd Co, supra.* In *Baker v General Motors Corp,* 409 Mich 639, 660; 297 NW2d 387 (1980), we explained the requirement of causal connection:

"An individual is disqualified for benefits under the basic provision if a disqualifying labor dispute is shown to be a substantial contributing cause of his or her unemployment. The dispute need not be the sole cause of the unemployment."

Lastly, it is appellants who bear the burden of

---

[9] A "labor dispute" is generally defined in similar fashion in other states. See Anno: *Unemployment Benefits—Labor Disputes,* 63 ALR3d 88, 107.

proving appellees' disqualification. *Michigan Tool
Co v Employment Security Comm, supra.*

## B

In both cases, appellees contend that the cause
of their unemployment was actually a layoff due to
economic reasons rather than a lockout as the
appellants claim. The practical distinction, of
course, is that appellants would be liable for un-
employment benefits for a layoff whereas they
would not be liable in a lockout situation. We shall
consider the facts of each case separately.

In *Smith,* the parties had a collective bargaining
agreement which expired at 12:01 a.m. on June 23,
1975. Representatives of both parties met on sev-
eral occasions in May and June of that year in
order to negotiate the terms of a new agreement.
However, negotiations broke down on the evening
of June 22, 1975, and the company informed the
union that the employees would be locked out the
next day in spite of the fact that the employees
were willing to continue working without a new
contract. A new contract was ratified on July 27,
1975, and the employees returned to work the next
day.

The above facts are not disputed. What follows
is the disputed portion of the testimony before the
MESC referee upon which the parties draw differ-
ing conclusions as to the cause of the unemploy-
ment.

Appellees contend that on the evening of June
22, 1975, the union felt that it was close to an
agreement but that it wanted to go over some
details of the new contract. However, the company
asked the union for its strike notice, and when
informed there would be no strike, the company

told them that it would lock out the employees. The union representative, Mr. Jones, testified that the company informed him that it did not need the employees. He was told that the company had engineers in the plant making changes, that some of the machines were torn down and that the plant was being cleaned up. Mr. Jones admitted that he had no personal knowledge of what was going on inside the plant. Mr. Jones also testified that in the previous year, the company had closed down in the first week of July.

Mr. Biondi, the company's representative, testified that early in the day on June 22, he felt that they were close to coming to an agreement. However, after a four-hour recess, the union came back in an adamant mood and asserted that none of the proposals were acceptable. Mr. Biondi testified that he advised the company to lock out the employees because he felt the negotiations were at a standstill. He felt that it was better to take a short-term loss resulting from a lockout rather than a three-year loss resulting from an unfavorable contract. Biondi further testified that had a new agreement been ratified on June 22, no lockout would have occurred.

During the period of the lockout, the company continued limited production with its supervisory staff. Mr. Biondi testified that the company could not meet the demands of its customers during this period and that other vendors were supplying their customers' demands. General Motors was allowed to remove some tooling they owned from the plant because the company was their sole supplier. Mr. Biondi denied that any revamping of the plant took place during the lockout and stated that only regular maintenance occurred. He testified that there was nothing planned as to a shut-

down during July. Further, Mr. Biondi testified that when the employees returned to work, there was a backlog of work and the company had to hire new employees to catch up.

The referee made the following findings of fact, in pertinent part:

"It is found from the record in this matter that the lockout by the employer was used as a weapon against the union and the employees for the purpose of attempting to secure a more favorable contract to the employer. We are not persuaded by any of the statements in the record that the employer used the period of time to re-do its plant, to cover up for what would otherwise be a shutdown or layoff because of depressed economic conditions. The lockout was nothing short of a bargaining tactic."

The referee's finding was upheld by the Michigan Employment Security Appeal Board and the circuit courts. The Court of Appeals did not address the referee's findings of fact, but instead chose to rely on *National Gypsum Co v Administrator, Louisiana Dep't of Employment Security, supra,* discussed in the previous section of this opinion.

The above review of the evidence in *Smith* indicates that the referee was called upon to determine an issue of credibility. Appellees produced evidence of a disguised layoff while appellant produced evidence of a lockout. This is exactly the type of situation where this Court must defer to the factfinder.

"Such review must be undertaken with considerable sensitivity in order that the courts accord due deference to administrative expertise and not invade the province of exclusive administrative fact-finding by displacing an agency's choice between two reasonably differing

views." *Michigan Employment Relations Comm v Detroit Symphony Orchestra, supra,* p 124.

In short, we find that the substantial contributing cause of the lockout, which of course was the immediate cause of unemployment, was a labor dispute. There was evidence that negotiations had broken down on the eve of the expiration of the collective bargaining agreement, that the employer locked out its employees to obtain a new contract more favorable to it and that the company had sufficient work to do during the lockout period and was in fact losing business to its competitors. There was also evidence to support appellees' contention of a disguised layoff, but where substantial evidence exists to support both sides and the agency must make a judgment assigning credibility to one side, we may not substitute our judgment for that of the agency.

In *Doerr,* the parties had been operating under a collective bargaining agreement which was to expire on June 1, 1971. On April 1, 1971, the company gave notice of its intent to terminate the agreement as of May 31, 1971. The representatives of both parties held 23 meetings in the two months prior to the expiration of the old contract trying to negotiate a new agreement. Early in the negotiations, the union offered to continue working under the old contract, but the company informed the union that it could not and would not continue under the terms of the old contract.

On May 26, 1971, the company made its final offer, which included a 9-cent per hour wage increase and certain non-economic proposals. The company indicated in a letter sent to the union that if the offer was not accepted, it would shut down the plant.

"Universal Engineering Division, having reached an impasse with the U.A.W. Local 1131 in its attempt to bargain, and having called in the FMCS for further assistance in negotiations, and after further attempts, still finds itself at an impasse in this labor dispute, having legitimate and substantial business reasons, including continuing substantial economic losses, low employment, low volume of incoming sales, customer resistance to placing orders with the division due to the uncertainty of operations due to labor negotiations, and the unwillingness of the union to grant the necessary efficiency and flexibility requests of Universal Engineering, will close the Frankenmuth plant as of midnight, May 31, 1971, because of this labor dispute.

"These matters were all discussed in considerable detail in this year's negotiation meetings.

"The economic and non-economic terms and conditions for a new contract, a copy of which is attached, is the final offer which would permit a settlement of this dispute.

"In consideration of the withdrawal of any and all union demands at Universal Engineering regarding a Houdaille Council, including the demand for a Houdaille Council step in the grievance procedure, Universal Engineering will continue to operate the Frankenmuth plant through June 4 to facilitate the current negotiations and to permit the union to hold necessary meetings to vote on the company final proposal. Operations of the plant after June 4 is [sic] subject to settlement of the current labor dispute."

On May 28 and 30, the union responded with counter-proposals, including a 35-cent per hour increase, a "30-and-out" pension plan and rejection of the company's non-economic proposals. The union also stated that it did not intend to strike.

"This proposal is made on the basis of the company withdrawing all the demands listed in the first paragraph of the company's proposal made May 26, 1971. Also, settlement of all other non-economic issues as

presented by the union. Plus, we are willing to bargain past May 31 until an agreement is reached. We have no intention of striking the plant with the understanding any agreement will be retroactive to June 1, 1971. We want to make it clear we have no intention of striking the plant at this time."

On May 31, 1971, the company locked out its employees. Approximately two weeks later, the company contacted the union and negotiations resumed. On August 23, 1971, the employees returned to work in response to a letter from the company's president inviting them to do so under the terms of the old agreement. In its letter inviting the employees back to work, the company explained that the lockout was being terminated "[i]n accordance with our understanding of the Executive Order of the President of the United States and related documents and public statements covering the ninety (90) day wage-price freeze effective August 15, 1971". A new contract was signed and ratified on January 13, 1972, which was effective retroactive to December 27, 1971.

Appellees contend that the company, as well as the machine tool industry in general, was in a serious economic slump prior to and at the time of the contract negotiations. The proofs submitted to the MESC Appeal Board by appellees included economic data presented by the company to the union in conjunction with the contract negotiations. The evidence demonstrated that the company's profit level from 1967 to 1970 had declined 432% and that the company estimated it was losing $1.38 for every employee hour worked in 1971 through the date of the shutdown. Direct and indirect labor hours at Universal declined 47.7% from 1967 through 1970. Appellees also introduced

before the appeal board a July 1, 1971, letter from the company to the MESC in which the company stated that it had laid off a clerical employee because of "the decline in incoming orders".

Appellees point to the fact that they resumed work August 23, 1971, under the terms of the expired labor contract under which they had agreed to continue working prior to the closing of the plant. In addition, appellees rely on the company's May 26, 1971, letter to the union in which it states economic reasons for the plant closing.

Appellant points out that more than 20 negotiating sessions preceded the lockout. From the onset of these negotiation sessions, the company advised the union that unless a new contract was agreed upon before the old contract expired, the company would not continue operations. John Engels, Universal's Industrial Relations Manager, testified at the MESC Referee hearing as follows:

"We had to know what our [inaudible] and operational procedures would be under a new successor agreement and we couldn't continue to operate under the framework of the old agreement without knowing what we were going to be involved in, in a new agreement. We had no way of knowing what the final outcome would be and we knew that we were experiencing very, very many difficulties in regards to the operation under the present agreement and we had to know what our changes would be."

Appellant claims this testimony is buttressed by the company's May 26, 1971, letter to the union which indicates that a work stoppage would not be necessary if the union came to terms.

Appellant points out that it was the company which reinstituted negotiations. The recall of employees on August 23, 1971, under the terms of the

old contract, was in keeping with the intent and purpose of the August 15, 1971 Executive Order of the President of the United States. Executive Order No. 11615, 3 CFR, 1971-1975 Compilation, p 602.

During the bargaining, Universal argued for the inclusion of two new clauses dealing with the concept of "a fair day's work for a fair day's wages" and an "efficient operations" provision. It was in conjunction with these new clauses that Universal presented to the union the dismal financial data which appellees now rely on. This information was used to persuade the union that it was necessary to increase productivity and job flexibility to match the productivity levels of foreign workers. Appellant contends that it was simply using "the age-old negotiating technique of 'pleading poverty' ".

Appellant further contends that there was no direct evidence that it lacked work for its production workers in June 1971 or that it ever threatened economic layoffs of production personnel. Appellant explains that the layoff of the clerical worker does not support appellees' position because there is frequently a long delay between the time an order is received and the time in which production of the ordered item has been completed. Finally, appellant points out that it did not close any plant other than the one at which the labor dispute existed.

The referee concluded that the appellees were unemployed due to a labor dispute and, thus, he upheld the commission's disqualification. However, in reaching his conclusion, the referee stated that a labor dispute exists whenever negotiations are ongoing, citing *Lillard v Employment Security Comm, supra.* This was error. The definition of the

term "labor dispute" as set forth in Part 3A requires that there be a controversy. See *Salenius v Employment Security Comm,* 33 Mich App 228; 189 NW2d 764 (1971). Although the referee made additional findings of fact to support his finding of the existence of a labor dispute, we cannot be sure that this did not affect his decision.

This error was compounded by the appeal board when it reviewed the decision of the referee. Much of appellees' evidence was presented for the first time before the appeal board.[10] This included the letter of the company to the MESC regarding the laid-off clerical worker which the appeal board found irrelevant, and the company's May 26, 1971, letter to the union, along with the company's economic data, which the appeal board said did not provide "any material new information significantly relating to the question of whether or not the unemployment of the claimants in these matters was due to a labor dispute".

We disagree that the new evidence did not provide any material new information significantly relating to the labor dispute question. Although we make no finding regarding the weight or credibility to be accorded to this evidence, we find that it was relevant and material to appellees' theory that appellant's economic condition was the substantial contributing cause of their unemployment.

An employer may not use the failure to reach an agreement as a pretext for charging a labor dispute when it would otherwise have curtailed operations because of economic conditions. But where economic conditions would not have other-

---

[10] The new evidence was accepted and made a part of the record pursuant to the appeal board's granting of appellees' motion to introduce the exhibits. See MCL 421.35(1); MSA 17.537(1); MCL 421.36(3); MSA 17.538(3).

wise caused the curtailment of operations, but only have played a part in the decision to utilize the lockout tactic, *i.e.,* when the labor dispute is the substantial contributing cause, the employees may properly be disqualified.[11] This determination is necessarily a question of fact.

We think that the appeal board treatment (or lack of treatment) of the evidence indicates that it did not realize that it must not only decide whether a labor dispute existed, but whether the labor dispute was the substantial contributing cause of the appellees' unemployment. If the board did recognize and decide this question, it has failed to make any finding of fact in this regard. Obviously, we cannot review findings of fact if none exist. As we have emphasized numerous times in cases involving workmen's compensation, "conclusory findings are inadequate because we need to know the path [the board] has taken through the conflicting evidence, the testimony it has adopted, the standards followed and the reasoning used to reach its conclusion". *Kostamo v Marquette Iron Mining Co,* 405 Mich 105; 274 NW2d 411 (1979).

We remand to the board of review[12] for further

---

[11] The circuit court noted in this regard:

"No doubt economic conditions influenced the decision of the employer to lock out its employees to coerce agreement if its final offer was not accepted; and it may have welcomed the opportunity to do so. Likewise, economic conditions undoubtedly influenced the union's decision to offer to work under the old contract and not strike. Probably economic conditions always influence such decisions. It is most unlikely that an employer would lock out employees who are willing to work under a profitable contract in good times for the industry. And an employer need not lock out employees who are unwilling to work. That would be futile."

We concur with the trial judge that probably economic conditions will always be a factor in a lockout or strike decision. As far as the appellant "welcom[ing] the opportunity to do so" in this case, we leave that decision to the board of review on remand.

[12] The board of review is the present successor to the appeal board. See 1977 PA 52; MCL 421.35(3); MSA 17.537(3).

proceedings consistent with this opinion. We retain jurisdiction.

## C

Having determined that appellees in *Smith* were unemployed due to a labor dispute, we must next decide if appellees were directly interested in the labor dispute. Section 29(8)(a) of the ESA sets forth four criteria by which direct involvement is determined. We find that subpart (ii) is the applicable criterion in these cases:

"For the purposes of this subsection an individual shall not be deemed to be directly involved in a labor dispute unless it is established that:

\* \* \*

"(ii) He is participating in or financing *or directly interested in the labor dispute* which causes his total or partial unemployment. \* \* \*"

Section 29(8)(b) further defines the term "directly interested" as follows, in pertinent part:

" 'Directly interested' as used in this subsection shall be construed and applied so as not to disqualify individuals unemployed as a result of a labor dispute the resolution of which may not reasonably be expected to affect their wages, hours, or other conditions of employment, and to disqualify individuals whose wages, hours, or conditions of employment may reasonably be expected to be affected by the resolution of the labor dispute. A 'reasonable expectation' of an effect on an individual's wages, hours, or other conditions of employment shall be deemed to exist, in the absence of substantial preponderating evidence to the contrary:

\* \* \*

"(ii) If it is established that 1 of the issues in or purposes of the labor dispute is to obtain a change in

the terms and conditions of employment for members of the individual's grade or class of workers in the establishment in which the individual is or was last employed; * * *."

We think that it is clear that one of the purposes of the labor dispute involved here was to obtain a change in the terms and conditions of appellees' employment. We reject, as being contrary to the clear wording of the statute, the argument that each provision of § 29(8)(a) requires a voluntary stoppage of work on the part of the employee. Therefore we find that appellees were directly interested in the labor dispute.

IV

The appellees in *Smith* contend that if § 29(8) is construed to allow benefits for employees who are unemployed due to a lockout at a functionally integrated establishment, while denying benefits to an employee who is unemployed due to a lockout in the establishment in which he is or was last employed, the disqualification is arbitrary and denies them equal protection of the law. Appellees in *Doerr* had this issue decided adversely to them in the circuit court and the Court of Appeals and have not raised the issue in this Court.

Appellees' primary contention is that in analyzing the reasonableness of a statutory classification, a court must look to the purpose of the statute. Appellees claim that they were involuntarily unemployed and, thus, they fall within the purpose of the legislation as set forth in MCL 421.2; MSA 17.502, *i.e.,* to provide benefits to workers involuntarily unemployed. Other workers who are involuntarily unemployed as a result of being laid off or as a result of a lockout in a functionally inte-

grated establishment are entitled to receive unemployment benefits.

In *Ohio Bureau of Employment Services v Hodory,* 431 US 471; 97 S Ct 1898; 52 L Ed 513 (1977), the Court addressed an equal protection challenge to Ohio's unemployment labor disqualification provision. The Ohio statute[13] disqualified plaintiff, who was furloughed as the result of a strike at another plant owned by plaintiff's employer. The basis of plaintiff's complaint was that the state may not deny benefits to those who are unemployed through no fault of their own.

The Court upheld the constitutionality of the statute stating, in relevant part:

"The statute does not involve any discernible fundamental interest or affect with particularity any protected class. Appellee concedes that the test of constitutionality, therefore, is whether the statute has a rational relation to a legitimate state interest. Brief for Appellee 29. See *New Orleans v Dukes,* 427 US 297 [96 S Ct 2513; 49 L Ed 2d 511] (1976). Our statement last Term in *Massachusetts Bd of Retirement v Murgia,* 427 US 307 [96 S Ct 2562; 49 L Ed 2d 520] (1976), explains the analysis:

" 'We turn then to examine this state classification under the rational-based standard. This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary. *Dandridge v Williams,* [397 US 471,] 485 [90 S Ct 1153; 25 L Ed 2d 491 (1970)]. Such action by a legislature is presumed to be valid.' *Id.,* at 314.

\* \* \*

" 'If the classification has some "reasonable basis," it does not offend the Constitution simply because the

---

[13] Ohio Rev Code Ann § 4141.29(D)(1)(a).

classification "is not made with mathematical nicety or
because in practice it results in some inequality." *Linds-
ley v Natural Carbonic Gas Co,* 220 US 61, 78 [31 S Ct
337; 55 L Ed 369 (1911)].' *Dandridge v Williams,* 397 US
at 485. The rationality of this treatment is, of course,
independent of any 'innocence' of the workers collecting
compensation."

The Court found that Ohio's form of state neu-
trality which is accomplished through denial of
benefits for striking employees is not irrational.
Further, the Court held that protection of the
fiscal integrity of the fund is a legitimate concern
of the state.

In Michigan, the standard of review in scrutiniz-
ing legislation which is primarily social and eco-
nomic against a claimed violation of equal protec-
tion is also the rational basis test. Appellees must
show that the classification is arbitrary and wholly
unrelated in a rational way to the objective of the
statute. *In re Kasuba Estate,* 401 Mich 560, 568-
569; 258 NW2d 731 (1977); *McAvoy v H B Sher-
man Co,* 401 Mich 419, 453-454; 258 NW2d 414
(1977).

We find that there exists a rational basis for the
Legislature's treatment of lockouts in relation to
unemployment benefits. The Legislature could
have chosen to distinguish between claimants who
are laid off and claimants who are unemployed
due to a strike or lockout in order to preserve the
state's neutrality in labor disputes. The policy of
the ESA is not only to provide relief from involun-
tary unemployment, but also includes the subsid-
iary policy of maintaining the state's neutrality in
labor disputes. *Lawrence Baking Co v Unemploy-
ment Compensation Comm, supra; Linski v Em-
ployment Security Comm,* 358 Mich 239; 99 NW2d
582 (1959); *Noblit v The Marmon Group, supra.*

The Legislature may have determined that the payment of benefits to locked-out employees would weaken the effectiveness of the lockout as a bargaining tactic and may have chosen to leave intact the lockout as the employer's counterpart to the strike.

The Legislature also could have rationally distinguished between an employee locked out at his own place of work and an employee who is unemployed due to a lockout at a functionally integrated establishment. It is apparent from the 1963 amendments to § 29(8), which included the addition of the functionally integrated clause, that the Legislature was concerned with eliminating the weapon which employees previously had in being able to strike a key plant, thereby forcing an employer to pay benefits to laid-off employees at functionally integrated plants.[14] It is not unreasonable to conclude that the Legislature intended to eliminate the corresponding weapon of employers in utilizing a lockout to avoid paying unemployment benefits to employees laid off at functionally integrated plants. This goal furthers both aforementioned policies of the ESA.

Whether or not we agree with the wisdom of the lines the Legislature has drawn, we cannot say that they lack a rational basis. Thus, we conclude that the Legislature's treatment of lockouts in § 29(8) does not violate equal protection.

## V

In conclusion, we hold that a lockout may be a manifestation of a "labor dispute in active progress" as that term is utilized in the ESA. If a

---

[14] 1963 PA 226. See the authorities cited in fn 3, *supra*.

claimant cannot work because of a lockout "in the establishment in which he is or was last employed", *and* if the substantial contributing cause of the lockout is a labor dispute, then the claimant falls within the purview of the disqualification of § 29(8). We further hold that if a lockout occurs "in any other establishment within the United States which is functionally integrated with the [claimant's] establishment and is operated by the same employing unit", and if the lockout is the substantial contributing cause of the claimant's unemployment, then the claimant falls without the disqualification of § 29(8) and is eligible for benefits. We conclude that this classification does not violate the Equal Protection Clause.

In *Smith,* we find that there was substantial, competent and material evidence to support the agency's finding that appellees were unemployed due to a labor dispute in which they were directly involved. Therefore, they were disqualified from receiving unemployment benefits. The decision of the Court of Appeals is reversed and the judgments of the trial courts are reinstated.

In *Doerr,* we remand to the board of review for further proceedings consistent with this opinion. We retain jurisdiction.

Finally, we grant the motions to strike the unauthenticated and extra-record material contained in the briefs of amicus Borden and amicus Michigan Manufacturers Association. *People v Robinson,* 390 Mich 629; 213 NW2d 106 (1973); *Anderson v Jersey Creamery Co,* 278 Mich 396; 270 NW 725 (1936).

No costs, a public question being involved.

COLEMAN, C.J., and KAVANAGH, WILLIAMS, and RYAN, JJ., concurred with FITZGERALD, J.

BLAIR MOODY, JR., J. *(for affirmance).* The issue presented in these cases is whether employees are entitled to unemployment compensation when they are locked out by their employer in spite of their willingness to continue working without a contract during negotiations, and in spite of their assurances that they would undertake no strike or picketing activity or otherwise interfere with the employer's business during that time. My colleagues conclude that such employees are not entitled to receive benefits as long as the lockout is a true manifestation of a labor dispute rather than merely a disguised layoff. Because a reading of the Michigan Employment Security Act (MESA), MCL 421.1 *et seq.;* MSA 17.501 *et seq.,* taking into account not only the literal meaning of its words, but also the broad remedial social policy it was meant to implement as part of a total labor relations scheme, compels a finding of compensation for the employees, I would affirm the decisions of the Court of Appeals.

## I

Resolution of the instant controversy requires judicial interpretation of the labor dispute disqualification provision of the MESA, MCL 421.29(8); MSA 17.531(8), a provision which itself has been the subject of much dispute and commentary.[1] This section provided,[2] in pertinent part:

"An individual shall be disqualified for benefits for

---

[1] See, *e.g.,* 6 Unemployment Ins Rep (CCH) 25,255.

[2] Minor stylistic changes were made in 1980. See 1980 PA 358.

any week with respect to which his total or partial unemployment is due to a labor dispute in active progress, or to shutdown or start-up operations caused by that labor dispute, in the establishment in which he is or was last employed, or to a labor dispute, other than a lockout, in active progress, or to shutdown or start-up operations caused by that labor dispute, in any other establishment within the United States which is functionally integrated with the establishment and is operated by the same employing unit. * * * An individual shall not be disqualified under this subsection if he is not directly involved in the dispute."

To disqualify an employee from receiving unemployment compensation under this provision, three elements must be satisfied. First, a labor dispute in active progress must exist. Secondly, such labor dispute must be a "substantial contributing cause" of claimants' unemployment, *Baker v General Motors Corp,* 409 Mich 639, 660; 297 NW2d 387 (1980), a determination which is largely a question of fact. Finally, claimant must be directly involved in the disqualifying labor dispute which causes his unemployment.[3]

It is concluded that the words "labor dispute in active progress" by definition do not contemplate a situation such as that in the instant cases, where bargaining is fluid, no economic action is undertaken, and the employees are willing to continue working while negotiating. The Legislature could not have intended, consistent with the policy of the MESA, to allow the employer to unilaterally declare a labor dispute in such circumstances, automatically denying employees the unemployment benefits they may need to survive.

---

[3] The statute sets forth four criteria for determining direct involvement. MCL 421.29(8)(a), subds (i)-(iv); MSA 17.531(8)(a), subds (i)-(iv). See also MCL 421.29(8)(b); MSA 17.531(8)(b).

## II

It is a well-known canon of statutory interpretation that the words of a statute should not be construed in isolation; that they gain their meaning from context and overall statutory purpose.[4] And, especially when a statement of purpose has been enacted into the statute itself, a court must read its provisions not solely in terms of their literal meaning, but rather as colored by and in the light of that stated policy.[5]

When the Michigan Legislature first enacted the MESA in 1936,[6] it included the following declaration of policy for use as a guide to interpretation:[7]

"The legislature acting in the exercise of the police power of the state declares that the public policy of the state is as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. *Involuntary unemployment is a subject of general interest and concern which requires action by the legislature to prevent its spread and to lighten its burden which so often falls with crushing force upon the unemployed worker and his family, to the detriment of the welfare of the people of this state.* Social security requires protection against this hazard of our economic life. Employers should be encouraged to provide stable employment. The systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment by the setting aside of unemployment reserves to be used for the benefit of persons unemployed through no

---

[4] Hart & Sacks, The Legal Process: Basic Problems in the Making and Application of Law (Cambridge Tentative Edition, 1958), p 1411.

[5] *Id.*, p 1413.

[6] 1936 (Ex Sess) PA 1, § 2.

[7] MCL 421.2; MSA 17.502.

The statement of policy was taken from "Draft Bills" prepared by the Committee on Economic Security of the Social Security Board. See Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification*, 17 U Chi L Rev 294 (1950).

fault of their own, thus maintaining purchasing power and limiting the serious social consequences of relief assistance, is for the public good, and the general welfare of the people of this state."

Thus, as this Court stated in an early case:

"In view of this declaration of public policy, it is evident that the purpose of the unemployment compensation act is to provide protection against the evils incident to involuntary unemployment, and thus, to foster social and economic security for the people of our State. The act is intended to provide benefits for those who are unemployed through no fault of their own, who are willing, anxious, and ready to obtain employment so that they may support themselves and their families. It is intended to benefit persons who are genuinely attached to the labor market, and who are unemployed because of conditions therein over which they have no control." *Dwyer v Unemployment Compensation Comm,* 321 Mich 178, 188; 32 NW2d 434 (1948).

Commentators and Michigan courts have also recognized that the effect of the MESA goes beyond the payment of compensation to an individual or group of claimants; benefits are designed to run to claimants' families, and, in an even broader sense, to the benefit of the public generally. *Lillard v Employment Security Comm,* 364 Mich 401; 10 NW2d 910 (1961). The unemployment compensation acts are designed to keep money circulating in times of economic insecurity[8] and thereby provide a buffer against a downward economic spiral.[9]

[8] Williams, *The Labor Dispute Disqualification—A Primer & Some Problems,* 8 Vand L Rev 338 (1955).

[9] "Thus unemployment compensation is not paid primarily to reward the employee nor to punish the employer, but rather to protect the stability of the state and of the family, by relieving the family distress and the menace to the public welfare occasioned through unemployment of individual workers." *National Gypsum Co v Administrator, Louisiana Dep't of Employment Security,* 313 So 2d 230, 232

Since 1936, this legislatively declared public policy has provided a context for judicial construction of the provisions of the unemployment compensation statute, including the labor dispute disqualification. See, *e.g., I M Dach Underwear Co v Employment Security Comm,* 347 Mich 465; 80 NW2d 193 (1956); *Dwyer v Unemployment Compensation Comm, supra; Copper Range Co v Unemployment Compensation Comm,* 320 Mich 460; 31 NW2d 692 (1948). Consistent with the stated purpose of providing relief from the hardship of involuntary unemployment, our courts have stressed the remedial, social welfare nature of the MESA, requiring that the statute be liberally construed to achieve its purpose and allow benefits, and that disqualifications from benefits be narrowly interpreted. *Copper Range Co v Unemployment Compensation Comm, supra; Godsol v Unemployment Compensation Comm,* 302 Mich 652; 5 NW2d 519; 142 ALR 910 (1942); *Salenius v Employment Security Comm,* 33 Mich App 228; 189 NW2d 764 (1971); *Fifth Dist Republican Committee v Employment Security Comm,* 19 Mich App 449; 172 NW2d 825; 43 ALR3d 1343 (1969).[10] Additionally, the employer bears the burden of proving the employees' disqualification. *Michigan Tool Co v Employment Security Comm,* 346 Mich 673; 78 NW2d 571 (1956).

To be sure, both the statute and case law clearly indicate that involuntariness of unemployment is not now and probably never was the sole or ultimate factor in determining the award of MESA

(La, 1975). See also Burns, *Unemployment Compensation and Socio-Economic Objectives,* 55 Yale LJ 1 (1945).

[10] "A liberal interpretation requires that we view with caution any construction of the act which would narrow its coverage and deprive persons entitled thereto of the benefits of the act." *Fifth Dist Republican Committee v MESC,* 19 Mich App 449, 452-453; 172 NW2d 825; 43 ALR3d 1343 (1969).

benefits. Thus, benefits are payable to claimants who leave work voluntarily with good cause[11] or who voluntarily refuse suitable work for good cause. MCL 421.29(1), subds (a) and (e); MSA 17.531(1), subds (a) and (e).

On the other hand, this Court has upheld the denial of benefits in the opposite situation despite the fact that the workers' unemployment appears objectively involuntary. For example, in *Noblit v The Marmon Group,* 386 Mich 652; 194 NW2d 324 (1972), we held that truck drivers who were willing but unable to work because of a strike by foundry workers at the truckers' place of business were not entitled to unemployment compensation.[12]

Nevertheless, until the Legislature specifically strikes it from the statute, the goal of helping those unemployed through no fault of their own remains the primary purpose of the MESA. Even the "involuntary" unemployment cases where benefits have been denied reflect that policy.

All of those prior situations in which the labor dispute disqualification has applied have contained some element of voluntary economic action by a group of employees, if not claimants themselves, by others closely associated with them. In each case, such employee actions as a strike, *Noblit, supra; Scott v Budd Co,* 380 Mich 29; 155 NW2d 161 (1968), or threat to strike, *Bedwell v Employment Security Comm,* 367 Mich 415; 116 NW2d 920 (1962), sometimes accompanied by picketing, *Nobes v Unemployment Compensation Comm,* 313 Mich 472; 21 NW2d 820 (1946), or a slowdown, *Chrysler Corp v Smith,* 297 Mich 438; 298 NW 87;

[11] In recent amendments to the MESA, the Legislature virtually eliminated compensation in the case of such voluntary "quits" occurring after March 1, 1981, and before April 1, 1983. 1980 PA 358, § 69.

[12] The disqualification was based on MCL 421.29(8)(a), subd (iv); MSA 17.531(8)(a), subd (iv).

135 ALR 900 (1941), either directly caused or were a manifestation of the labor dispute which caused the unemployment.

The current language of the labor disqualification provision itself was enacted in response to this type of "involuntary" unemployment. Legislative disapproval of this Court's refusal[13] to disqualify Ford Motor Company employees "involuntarily" laid off in Michigan because of a strike at the Ford plant in Canton, Ohio, led to wholesale changes in § 29(8).[14]

The situation in the instant cases presents a marked contrast to that of such prior cases. Rather than using weapons of economic warfare, the employees specifically refrained from resorting to such tactics. It is clear that the employees reflected an attitude of cooperation, not active economic confrontation. In essence, the voluntary acts of employees involved in *Smith* and *Doerr,* namely the simple rejections of the employers' contract offers, are qualitatively far different from the aggressive economic warfare activities at issue in prior cases.

Thus, the extension of the disqualification holdings of cases such as *Noblit* to deny benefits in the instant situations requires a departure from the MESA's policy of providing relief from the hardship of involuntary unemployment substantially greater than ever considered before. Especially in view of the history of construing this remedial

[13] *Park v Employment Security Comm,* 355 Mich 103; 94 NW2d 407 (1959).

[14] See 6 Unemployment Insurance Rep (CCH) 25,255-25,256. The bill which incorporated the changes, 1963 PA 226, was called the "Ford-Canton" bill.

Since 1963, when these major changes were enacted, the Legislature has amended the labor disqualification section several times. See 1974 PA 104; 1975 PA 110; 1980 PA 358. The changes were primarily technical, and for the purposes of the instant cases, are of no substantive effect.

statute liberally to achieve its stated purpose, this Court should not endorse such a departure.

## III

Denial of unemployment compensation to the locked-out claimants in the instant cases also would conflict with Michigan's labor relations policy of encouraging the peaceful resolution of labor disputes. This goal is codified in the labor mediation act, MCL 423.1; MSA 17.454(1):

"It is hereby declared as the public policy of this state that the best interests of the people of the state are served by the prevention or prompt settlement of labor disputes; *that strikes and lockouts and other forms of industrial strife, regardless of where the merits of the controversy lie, are forces productive ultimately of economic waste;* that the interests and rights of the consumers and the people of the state, while not direct parties thereto, should always be considered, respected and protected; and that the voluntary mediation of such disputes under the guidance and supervision of a governmental agency will tend to promote permanent industrial peace and the health, welfare, comfort and safety of the people of the state."

The application of the MESA often affects the labor relations strategies of the parties involved. In *Noblit,* this Court acknowledged, in effect, how the purposes of the two statutes intersect. Describing the policy of the MESA, we stated:

"That policy is not only to relieve from involuntary unemployment, *but to do so in a manner calculated to avoid any encouragement of work stoppages arising out of labor disputes."* 386 Mich 655.

However, the view urged by the employers leads

to the exact opposite of this desired effect. Disqualifying locked-out employees will encourage employers to use that tactic, which most often results in production shutdowns, work stoppages and a polarization of positions, rather than to continue peaceful negotiations in an effort to reach a solution.

## IV

My colleagues construe the unemployment compensation statute by looking to the literal meaning of the words involved. It is suggested that a labor dispute "means no more than a controversy between employer and employees regarding hours, wages, conditions of employment or recognition of a bargaining representative". *General Motors Corp v Employment Security Comm,* 378 Mich 110, 117; 142 NW2d 686 (1966). A lockout is one form or manifestation of such a dispute where an employer withholds work from his employees to gain concession from them. 4 Restatement of Torts, § 787, Comment a, p 128.[15]

Yet the fact that these words appear in the context of a disqualification provision which is to be narrowly construed must be kept in mind. This is especially true because we are confronted with a provision about which it has been said: "[m]uch-amended section 29 is not a stellar example of legislative draftsmanship." *Graham v Fred Sanders Co,* 11 Mich App 361, 373; 161 NW2d 601 (1968).

Even though it fits within the literal definition,

---

[15] This section, along with others concerned with trade practices and labor disputes, has been omitted from the Restatement of Torts, 2d, "in the view that these subjects have become substantial specialties, in their own right, governed extensively by legislation and largely divorced from their initial grounding in the principles of torts". 4 Restatement of Torts (2d), Introduction, p vii. The lockout definition, however, remains valid.

"[a] lockout is not entitled to automatic designation as a labor dispute" under § 29(8), because "[i]f it were, by designating a layoff as a lockout an employer could avoid the unemployment consequences of a layoff and frustrate the purpose of the Employment Security Act". *Salenius v Employment Security Comm,* 33 Mich App 228, 238-239; 189 NW2d 764 (1971). By the same token, and for the same reasons, the phrase "a labor dispute in active progress" should not be given a broad construction, which also may technically conform to the literal meaning of the words, but is inconsistent with the purposes of the act.

As a further aid to interpretation, my colleagues invoke the maxim *expressio unius est exclusio alterius.* The argument runs as follows: The Legislature specifically exempted lockouts from the labor dispute disqualification for claimants who are unemployed due to a labor dispute at a *functionally integrated* establishment, and it failed to similarly limit the labor dispute disqualification for claimants unemployed due to a labor dispute at *their own* establishment. Therefore, if the Legislature had intended to exclude lockouts in the latter situation, it would have specifically done so, as it did in the case of disputes at functionally integrated establishments.

There are several problems with this interpretation. First, because this section does not represent a "stellar example of legislative draftsmanship", *Graham v Fred Sanders Co, supra,* it is difficult to discern legislative intent from the words alone. Second, maxims such as *expressio unius* should serve as a guide to interpretation, not a strict rule of construction to dictate a result.[16] In addition, when a remedial statute such as the MESA is

[16] Hart & Sacks, p 1412.

involved, the use of such maxims to interpret legislative silence may be especially inappropriate. Where an exclusion is involved in a remedial statute, the Legislature must make its intent clear. Courts should not disqualify claimants not expressly excluded by the Legislature. *Fifth Dist Republican Committee v MESC,* 19 Mich App 449; 172 NW2d 825; 43 ALR3d 1343 (1969).

In fact, it is equally tenable that if the Legislature had contemplated the suggested interpretation of the instant cases, it would have added the phrase *"including* a lockout" after "labor dispute" when referring to such disputes in the claimant's own establishment to parallel the phrase "other than a lockout" used with reference to disputes in a functionally integrated establishment.

Finally, as Judge MAHER cogently noted in his concurrence in the Court of Appeals decision to grant claimants benefits in *Doerr:*

"[T]he express exception for lockouts in other establishments [does not compel] the conclusion that the Legislature intended that *any lockout* in the establishment in which the claimant is employed would disqualify him for benefits, without regard to the genesis of the lockout. I am of the opinion that the Legislature simply intended that no claimant would be disqualified because of a lockout at a plant other than that at which he is employed whatever the circumstances of that lockout. As to lockouts in the establishment in which the claimant is employed, I agree that in a labor dispute where, for example, the employees are no longer willing to bargain, or where ultimatums are delivered or concessions demanded as a condition of continuing work, or a strike or a slowdown is threatened, and a lockout results, employees are disqualified from receiving unemployment compensation benefits under MCL 421.29(8); MSA 17.531(8). * * * Where an employer locks out employees who are willing to work and to continue

peaceful negotiations, however, * * * the employees are not disqualified from benefits." 90 Mich App 455, 476; 282 NW2d 352 (1979).

V

My colleagues' opinion acknowledges the inconsistency between their construction of the labor dispute disqualification and the purpose of the act in this context where the locked-out claimants were willing to work during negotiations. The conflict is justified as an example of a rule of statutory construction which states:

"Where a statute expresses first a general intent, and afterwards an *inconsistent* particular intent, the latter will be taken as an exception from the former and both will stand." 1 Lewis' Sutherland Statutory Construction (2d ed), § 268, p 515.

However, resolution of the instant cases does not require such inconsistency; a better approach is to harmonize, if possible, the construction of the term "labor dispute in active progress" with the declared purpose of the Michigan Employment Security Act as a whole.

The Indiana and Montana courts have adopted such an approach, which respects the integrity of both the labor dispute provision and the statutory policy. The result is an "impasse" test which narrows the definition of a "labor dispute in active progress"; where the facts show "good faith negotiations between representatives of management and labor", and "the bargaining is in a fluid state and no impasse has occurred", a disqualifying labor dispute does not exist. *Bootz Manufacturing Co v Review Board of Employment Security Divi-*

*sion,* 143 Ind App 17, 23; 237 NE2d 597 (1968).[17]
Good faith negotiations, in and of themselves, do
not constitute a labor dispute. *Id.* See also *Salenius
v Employment Security Comm,* 33 Mich App 228;
189 NW2d 764 (1971).[18] Thus, as long as negotia-
tions remain fluid, the employer cannot unilater-
ally declare a labor dispute to deny the employees
unemployment compensation.

An impasse is "the *absence* of 'an atmosphere in
which a reasonable foreseeable settlement of the
disputed issues might be resolved'". *Gold Bond
Building Products Division National Gypsum Co,
Shoals Plant v Review Board of the Indiana Em-
ployment Security Division,* 169 Ind App 478, 490;
349 NE2d 258 (1976). Further, consistent with
interpretations of the National Labor Relations
Act,[19] if the parties are deadlocked on "key" issues,
without which a final agreement is impossible, a
settlement is not reasonably foreseeable. *Gold
Bond Building Products, supra,* 490-491.

The impasse test has proven to be a workable
and fair rule. It brings the labor dispute disqualifi-
cation into harmony not only with the Employ-
ment Security Act's declared purpose, but also
with the national and state[20] policy of encouraging

---

[17] See also *Gold Bond Building Products Division National Gypsum
Co, Shoals Plant v Review Board of the Indiana Employment Security
Division,* 169 Ind App 478; 349 NE2d 258 (1976); *City Pattern v
Review Board of Indiana Employment Security Division,* 147 Ind App
636; 263 NE2d 218 (1970); *International Steel Co v Review Board of
Indiana Employment Security Division,* 146 Ind App 137; 252 NE2d
848 (1969); *Montana Ready Mixed Concrete Ass'n v Board of Labor
Appeals,* 175 Mont 143; 572 P2d 915 (1977).

[18] As noted in my colleagues' opinion, at page 265, the referee in
*Doerr* erred in concluding that a labor dispute exists as soon as
negotiations begin. We agree that this error requires a remand.

[19] 29 USC 151 *et seq.* See, *e.g., American Federation of Television &
Radio Artists, AFL-CIO v National Labor Relations Board,* 129 US
App DC 399; 395 F2d 622 (1968).

[20] See Labor Management Relations Act, 29 USC 141(b); MCL 423.1;
MSA 17.454(1).

good-faith collective bargaining as opposed to a resort to economic warfare. And, it does not encourage the employer to use denial of unemployment compensation benefits to enforce its bargaining demands. Yet, the "impasse" test has not been one-sided; since its adoption, the courts have denied benefits as well as granted them.[21] For the foregoing reasons, this Court should adopt the same standard for a disqualifying labor dispute.[22] Application of the impasse test to the instant cases would require a remand to the board of review in *Smith* as well as *Doerr* for a determination of whether an impasse existed.[23]

The same fairness and policy considerations that led the Indiana and Montana courts to adopt the impasse test dictate that, even if this Court declines to do the same, we not construe the labor dispute disqualification so broadly as to include the situation in the instant cases. In *National Gypsum Co v Administrator, Louisiana Dep't of Employment Security,* 313 So 2d 230, 233 (La, 1975), the state Supreme Court held that the disqualification should apply only to unemployment caused by labor disputes "in which the employee himself actively engages by refusing to work".

---

[21] See *Albett v Review Board of Indiana Employment Security Division,* 150 Ind App 202; 275 NE2d 827 (1971).

[22] Some Michigan courts have, in fact, used the impasse test. See *Keeler v C M Hall Lamp Co,* Docket No 73-247-518-AE (Wayne Circuit Court, July 25, 1978). In *Baker v General Motors Corp,* the Genesee Circuit Court held that since the parties had not bargained to impasse, no labor dispute existed. It specifically noted that a "labor dispute in active progress" should not be so broadly construed as to include good faith bargaining prior to impasse. In reversing the circuit court result, neither the Court of Appeals nor the Supreme Court directly addressed this argument. *Baker v General Motors Corp,* 74 Mich App 237; 254 NW2d 45 (1977), *rev'd* 409 Mich 639; 297 NW2d 387 (1980).

[23] In *Smith,* the parties disagree about whether they bargained to impasse, the employer claiming the parties did so, the union denying it.

Paying benefits to the instant claimants would be far more consistent with the purpose of providing relief from unemployment in a manner which avoids encouraging work stoppages than is denying compensation. In both cases, the employees expressed their willingness to work under the terms of the old contract while a new one was being negotiated. Even after they were locked out, the employees in *Smith* did not picket or do anything to interfere with the company's operation of its plants. In *Doerr,* the employees ultimately did return to work under the old contract terms, and worked at full efficiency during the continuing negotiations. Refusal to pay unemployment compensation under these circumstances will discourage such attempts at labor peace.

All of the foregoing considerations are magnified in a state such as Michigan, where unemployment in times of economic stress far outpaces that of the rest of the nation,[24] and where the implementation of the MESA policy is so necessary for the survival of not only individual claimants, but also their employers and the economy as a whole.[25]

## VI

Appellant employers argue that awarding benefits to claimants would represent an intrusion into questions of policy reserved to the Legislature. We

[24] Of the ten areas in the United States hardest hit by unemployment, seven are located in Michigan, according to figures released by the United States Department of Labor on December 15, 1980. The unemployment rates in these seven areas ranged from 12.2 to 16.4 percent. *Detroit Free Press,* December 16, 1980, p 3A, col 8.

[25] For this reason, the fact that a great majority of other states have construed their unemployment compensation acts to disqualify employees in the same position as the instant claimants, Anno: *Unemployment compensation: Application of labor dispute disqualification for benefits to locked out employee,* 62 ALR3d 437, is not dispositive.

reject that contention. On the contrary, it is the
job of this Court to construe the statutory lan-
guage, harmonize it if necessary with the statutory
purpose, and apply it to the facts of the case. With
respect to the MESA, this Court has repeatedly
stated:

> "It is not the proper function of this Court to amend
> the statute to *broaden or extend* the disqualifications
> fixed by plain language by the Legislature." *Sullivan v
> Employment Security Comm,* 358 Mich 338, 341; 100
> NW2d 713 (1960). See also *Thomas v Employment
> Security Comm,* 356 Mich 665, 669; 97 NW2d 784
> (1959).

Consonant with this statement, it is deemed appro-
priate in the instant cases to *narrow* or *limit* the
scope of the disqualification to make it consistent
with the act's declared purposes.[26] Similar action
has been taken in the past. In *Holdridge v Tecum-
seh Products Co,* 80 Mich App 310; 263 NW2d 600
(1977); *lv den* 403 Mich 851 (1978), the Court of
Appeals incorporated a "fear of violence" excep-
tion into the labor dispute disqualification and
granted compensation to employees who refused to
cross a picket line during a strike at their plant.

In further support of this interpretation of the
labor dispute disqualification, it should be noted
that the Legislature has failed to respond to the
Court of Appeals decisions awarding benefits in
both *Smith* and *Doerr.*[27] In the instant situation,
several factors combine to give increased signifi-
cance to this legislative inaction.

First, in the past, the Legislature has not hesi-

---

[26] "The meaning of words can almost always be narrowed if the
context seems to call for narrowing." Hart & Sacks, p 1412.

[27] *Doerr v Universal Engineering Division, Houdaille Industries,
Inc,* 90 Mich App 455; 282 NW2d 352 (1979); *Smith v Employment
Security Comm,* 89 Mich App 212; 280 NW2d 489 (1979).

tated to respond when it has disagreed with a
court's interpretation of the MESA. The complex
labor disqualification language under consideration
today was itself enacted in response to, and in
disapproval of, the decision of this Court in *Park v
Employment Security Comm,* 355 Mich 103; 94
NW2d 407 (1959). *Park* provides an analogy to the
instant cases. In *Park,* as here, the appellate
courts construed the labor dispute disqualification
provision narrowly to grant benefits to claimants.[28]
After *Park,* the Legislature changed the statute to
modify the decision; after *Smith* and *Doerr,* both
published Court of Appeals decisions, the Legisla-
ture has been silent. Certainly, if the Legislature
disapproved of those decisions, it would have
changed the law, as it did following *Park.*

Second, if it disagreed with the grant of benefits
in *Smith* and *Doerr,* the Legislature had the op-
portunity and legislative vehicle to express that
disagreement. In 1980, major amendments to the
MESA were enacted. Substantive changes were
made affecting portions of § 29, which lists all the
bases for disqualification. 1980 PA 358. Yet, in
spite of two appellate court decisions construing its
language, the Legislature made only minor stylis-
tic changes in § 29(8), the disqualification for labor
disputes. Under these circumstances, it cannot be
summarily concluded that awarding unemploy-
ment compensation to the instant claimants con-
flicts with legislative intent; if any inconsistency
existed, it is not likely that the Legislature would
have remained silent.

---

[28] In *Park,* functionally integrated plants located in more than one
state were construed not to be a single establishment for disqualifica-
tion purposes. In response, the Legislature added language to disqual-
ify claimants whose unemployment was due to a labor dispute at an
establishment functionally integrated with their own.

## VII

We also reject the contention that awarding benefits to locked-out employees will violate the state's policy of maintaining neutrality in labor disputes. Such neutrality requires that the unemployment compensation fund not be used to support either side of a labor dispute through the denial or award of benefits. See *Lawrence Baking Co v Unemployment Compensation Comm,* 308 Mich 198; 13 NW2d 260; 154 ALR 660 (1944). As appellants see it, employees would be unfairly buttressed if benefits were awarded in *any* lockout situation. But this argument fails to ring fully true in these circumstances. Neutrality requires that the act be interpreted with a balanced approach.

"Just as unemployment compensation benefits may not be used to support employees during a strike, so too denial of benefits may not be used to strengthen the position of an employer who has locked out employees who are willing to work." *Doerr v Universal Engineering Division, Houdaille Industries, Inc,* 90 Mich App 455, 474; 282 NW2d 352 (1979) (MAHER, J., concurring).

When employees are willing to continue their tasks, without engaging in such economic action as a strike, slowdown, unwarranted absenteeism or picketing, the MESA was not intended to help enforce a lockout in this manner.[29]

---

[29] The Court of Appeals has properly disposed of the employers' argument that payment of unemployment compensation to locked-out employees interferes with their right to engage in lockouts as recognized by the National Labor Relations Act (NLRA). See *American Ship Building Co v National Labor Relations Board,* 380 US 300; 85 S Ct 955; 13 L Ed 2d 855 (1965). In *Holland Motor Express, Inc v Michigan Employment Security Comm,* 42 Mich App 19; 201 NW2d 308 (1972), the Court held that since lockouts are permitted but not protected under the NLRA, the MESA provision exempting from disqualification unemployment caused by lockouts at functionally

## VIII

Accordingly, in keeping with the purpose of the MESA to relieve the, hardship of involuntary unemployment and consistent also with Michigan's labor relations policy of encouraging the peaceful resolution of labor disputes, employees who are locked out in spite of their willingness to work during contract negotiations and who do not strike, threaten to strike, picket or engage in any other concerted economic warfare activity should be entitled to compensation for their unemployment. Therefore, I would affirm the decisions of the Court of Appeals in both *Smith* and *Doerr*.

LEVIN, J., took no part in the decision of this case.

integrated establishments was not inconsistent with the letter or spirit of the Federal law. See also *Unemployment Compensation Board of Review v Sun Oil Co of Pennsylvania,* 476 Pa 589; 383 A2d 519 (1978).