CAVANAGH, J.
(dissenting). Today, the majority holds that 11-carboxy-tetrahydrocannabinol (11-carboxy-THC) is a schedule 1 controlled substance and that a person violates the law if he drives with any amount of 11-carboxy-THC in his body. The full import of this decision can only be understood by recognizing that the majority’s interpretation means that a person can no longer legally drive a car if scientific testing can detect any amount of 11-carboxy-THC in his system. This means that weeks, months, and even years after marijuana was ingested, and long after any risk of impairment has passed, a person cannot drive a car without breaking the law if a test can detect the presence of 11-carboxy-THC. Because I believe that this interpretation disregards the statutory language chosen by the Legislature and results in an interpretation that violates the United States Constitution and the Michigan Constitution, I respectfully dissent.
11-CARBOXY-THC IS NOT A SCHEDULE 1 CONTROLLED SUBSTANCE BECAUSE IT IS NOT A DERIVATIVE OF MARIJUANA
This case involves an issue of statutory interpretation, and the primary goal of statutory interpretation is to give effect to the intent of the Legislature. The first step is to review the language of the statute. If the statutory language is unambiguous, the Legislature is presumed to have intended the meaning expressed in the statute, and judicial construction is not permissible. *343 In re MCI Telecom, Complaint, 460 Mich 396, 411; 596 NW2d 164 (1999). However, when a statute is ambiguous, “so that reasonable minds could differ with respect to its meaning, judicial construction is appropriate to determine the meaning.” Id.
MCL 257.625(8) states in relevant part:
A person, whether licensed or not, shall not operate a vehicle upon a highway or other place open to the general public or generally accessible to motor vehicles, including an area designated for the parking of vehicles, within this state if the person has in his or her body any amount of a controlled substance listed in schedule 1 under section 7212 of the public health code, 1978 PA 368, MCL 333.7212, or a rule promulgated under that section.... [Emphasis added.]
Marijuana itself is a schedule 1 controlled substance. MCL 333.7212(l)(c). “Marijuana” is defined as follows:
“Marihuana” means all parts of the plant Canabis [sic] sativa L., growing or not; the seeds thereof; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant or its seeds or resin. It does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound manufacture, salt, derivative, mixture, or preparation of the mature stalks, except the resin extracted therefrom, fiber, oil or cake, or the sterilized seed of the plant which is incapable of germination. [MCL 333.7106(3).]
Further, MCL 333.7212(l)(d) states that the following are also schedule 1 controlled substances:
Except as provided in subsection (2), synthetic equivalents of the substances contained in the plant, or in the resinous extractives of cannabis and synthetic substances, derivatives, and their isomers with similar chemical struc *344 ture or pharmacological activity, or both, such as the following, are included in schedule 1:
(i) A[1] ****cis or trans tetrahydrocannabinol, and their optical isomers.
(ii) A6 cis or trans tetrahydrocannabinol, and their optical isomers.
(iii) A3,4 cis or trans tetrahydrocannabinol, and their optical isomers.
Notably, when construing MCL 333.7212 as part of the Public Health Code, the provisions are “intended to be consistent with applicable federal and state law and shall be construed, when necessary, to achieve that consistency.” MCL 333.1111(1). Michigan’s definition of “marijuana” is identical in all relevant portions to the federal definition. See 21 USC 802(16).[1] Yet no federal court has held that 11-carboxy-THC is a schedule 1 controlled substance. As the Seventh Circuit Court of Appeals stated, “The legislative history of the [Controlled Substances] Act indicates that the purpose of banning marijuana was to ban the euphoric effects produced by THC.” United States v Sanapaw, 366 F3d 492, 495 (CA 7, 2004). Significantly, as every expert who testified in these cases acknowledges, 11-carboxy-THC has no pharmacological effects on a person.
*345 Further, the District of Columbia Court of Appeals held that “the definition of marijuana was intended to include those parts of marijuana which contain THC and to exclude those parts which do not.” United States v Walton, 168 US App DC 305, 307; 514 F2d 201 (1975). Numerous courts have also long held that the statute is intended to outlaw “all species of marijuana containing tetrahydrocannabinol. . . .” See, e.g., United States v Lupo, 652 F2d 723, 728 (CA 7, 1981) (emphasis added). Therefore, construing Michigan’s definition of “marijuana” to include 11-carboxy-THC is contrary to and inconsistent with years of federal law.
While the majority subtly criticizes the federal courts for using legislative history to reach their conclusions, as opposed to the “plain language” of the statute, the majority itself is guilty of ignoring the plain language of MCL 333.1111(1) to reach its conclusion. In MCL 333.1111(1), the Legislature states that provisions of the Public Health Code are intended to be construed consistently with applicable federal law. The Legislature did not state that the clear mandate to construe provisions consistently with federal law can be ignored when the majority believes that the federal courts have not properly decided the cases before them. Further, the majority’s seemingly minor critique of the use of legislative history is actually quite remarkable when one considers that the statutory language at issue in this case — as well as the language in the federal statute — is certainly not plain and unambiguous, no matter how much the majority tries to convince a reader that it is. This is best illustrated by reviewing the majority’s approach to interpreting this “plain” language.
To decide this case, the majority recognizes that the term “derivative” needs to be defined, so it consulted scientific dictionaries to do so. The majority found that *346 there were “divergent” definitions of “derivative” to such a degree that the members of the majority had to choose the one they believed would best effectuate the Legislature’s intent, using nothing to guide them except their beliefs.[2] Notably, the majority even states that it decided not to follow “most” definitions. Instead, the majority chooses to ignore most definitions because these definitions would not support the majority’s outcome, and the majority ultimately settles on the one definition that would allow it to best support its position.
Simply, contrary to the majority’s bold assertions, there is nothing plain or unambiguous about a statute that uses a term with definitions that are so diverse that they can support two totally different outcomes. In fact, this is the very meaning of the term “ambiguous.” A statute is ambiguous when “reasonable minds could differ with respect to its meaning....” In re MCI, supra at 411; see also Perez v Keeler Brass Co, 461 Mich 602, 610; 608 NW2d 45 (2000) (In a unanimous opinion from this Court, the term “refuses” was deemed ambiguous because it could reasonably be construed narrowly or broadly, resulting in two different meanings and two different outcomes.). And in cases in which statutory language is ambiguous, such as the case before us, and the cases involving similar language before the federal courts, use of legislative history to try and best effectuate the intent of the Legislature when interpreting unclear and ambiguous statutory language *347 is a better method than an analysis that attempts to divine the Legislature’s intent using nothing more than the personal beliefs of those in the majority.[3]
Moreover, not only does the majority ignore federal law in its analysis, it also ignores other relevant statutory provisions. To support its outcome, the majority merely cites various sources for the definition of “derivative” and notes that these sources offer divergent definitions. However, the majority resolves this ambiguity by ultimately selecting a definition that describes a derivative as a “ ‘chemical substance related structurally to another substance and theoretically derivable from it.’ ” Ante at 328, quoting Merriam-Webster’s Online Medical Dictionary. The majority does this because it believes that this definition most closely effectuates the intent of the Legislature.
But the majority ignores other statutory provisions that indicate that 11-carboxy-THC is not a schedule 1 controlled substance. Contrary to the majority’s position, MCL 333.7212 does not plainly and unambiguously classify 11-carboxy-THC as a schedule 1 controlled substance. 11-carboxy-THC is not listed *348 anywhere in the statute. The majority rests its entire argument on the use of the word “derivative” in the statute, but this analysis is flawed because the majority reaches a result that dismissively ignores the fact that 11-carboxy-THC has no pharmacological effect on a person. While MCL 333.7211 does not explicitly require that a substance have a pharmacological effect to constitute a schedule 1 controlled substance, the statute does explicitly state that a substance is classified as a schedule 1 controlled substance if it has a high potential for abuse, which naturally requires a pharmacological effect.
Our Legislature has stated that a substance is placed “in schedule 1 if [the administrator] finds that the substance has high potential for abuse and has no accepted medical use in treatment in the United States or lacks accepted safety for use in treatment under medical supervision.” MCL 333.7211 (emphasis added). But there is no dispute that 11-carboxy-THC has no pharmacological effect. All the experts — including experts Dr. Michelle Glinn, who is the supervisor of the toxicology laboratory of the Michigan State Police Crime Lab, and Dr. Felix Adatsi, both called to testify by the prosecution — admit that 11-carboxy-THC has no pharmacological effect on a person whatsoever.
Other factors listed by the Legislature to consider in making a determination about the classification of a substance are:
(a) The actual or relative potential for abuse.
(b) The scientific evidence of its pharmacological effect, if known.
(c) The state of current scientific knowledge regarding the substance.
(d) The history and current pattern of abuse.
*349 (e) The scope, duration, and significance of abuse.
(f) The risk to the public health.
(g) The potential of the substance to produce psychic or physiological dependence liability.
(h) Whether the substance is an immediate precursor of a substance already controlled under this article. [MCL 333.7202.]
None of these factors that are used to determine if a substance should be classified as a schedule 1 controlled substance applies to 11-carboxy-THC. 11-carboxy-THC has no pharmacological effect on a person, and, therefore, it has no potential for abuse or potential to produce dependence. Further, as expert witness Dr. Michael Evans testified, it is impossible to take 11-carboxy-THC and make it into THC; therefore, it is not an immediate precursor of a substance already classified as a schedule 1 controlled substance.
Our Legislature selected these factors and the words “high potential for abuse” for a reason — they cannot be ignored by the majority merely because they cannot be reconciled with the majority’s rationale. “It is a well-established rule of statutory construction that provisions of a statute must be construed in light of the other provisions of the statute to carry out the apparent purpose of the Legislature.” Farrington v Total Petroleum, Inc, 442 Mich 201, 209; 501 NW2d 76 (1993). “To that end, the entire act must be read, and the interpretation to be given to a particular word in one section arrived at after due consideration of every other section so as to produce, if possible, a harmonious and consistent enactment as a whole.” City of Grand Rapids v Crocker, 219 Mich 178, 182-183; 189 NW 221 (1922). The majority’s analysis ignores the very reasons that a substance is classified as a schedule 1 controlled sub *350 stance, and it reaches a result that completely disregards other relevant provisions of the statute.
Further, the majority makes pronouncements such as 11-carboxy-THC is a derivative “because it is a chemical compound produced when the body metabolizes THC, which is a compound of similar structure.” Ante at 326-327. The majority then states that “THC and 11-carboxy-THC are identical except that in 11-carboxy-THC, two oxygen atoms are added to and three hydrogen atoms are removed from the eleventh carbon to make it more water soluble and easier to excrete.” Ante at 327. But merely because a compound looks similar in its basic chemical formula does not mean that it is a compound of similar structure for the purposes of controlled substance classification methods. Water and hydrogen peroxide look similar — H20 and H202 — but they are, of course, very different substances. One is a substance you must drink to survive; the other will kill you if you drink it. Instead of trying to delve into areas of science in which the experts do not even agree, the majority should simply refer to the statutory language and the fact that when considering the factors selected by the Legislature, there is no rationale to classify 11-carboxy-THC as a schedule 1 controlled substance.
Incredibly, the majority attempts to present the expert testimony as being in agreement. See ante at 329 n 8. Yet this inaccurate representation is not supported when one actually reads and considers the full testimony of the experts. The experts are not in agreement about whether 11-carboxy-THC is a derivative of marijuana and, therefore, a schedule 1 controlled substance. While the experts may be in agreement over some scientific principles, they disagree over the key issue in this case, and it is misleading to present this in any *351 other manner. Notably, Dr. Daniel McCoy and Dr. Evans both testified that ll-carboxy-THC was a metabolite, but it was not a derivative and, therefore, ll-carboxyTHC was not a schedule 1 controlled substance. As Dr. McCoy explained, under the interpretation adopted by the majority “everything is a derivative, every chemical on earth can be derived from something else.” He further explained that, using the majority’s interpretation, if THC is burned, “we will develop a lot of chemicals, including carbon dioxide, to the extent a derivative is something that comes from and has similar chemical structure to some part, carbon dioxide would be scheduled material.....” Dr. Evans testified, “It [ll-carboxy-THC] is not a derivative.... To call car-boxy THC a derivative of THC would be like — carbon dioxide is a metabolite of THC. You’ll get that when you exhale or take in a breath.... If you were to call carboxy THC a derivative, you would have to call carbon dioxide a derivative of THC . ...” In short, Dr. McCoy and Dr. Evans disagreed with the majority’s interpretation because the rationale that would support classifying ll-carboxy-THC as a derivative would also apply to carbon dioxide; therefore, a person could be guilty of violating MCL 257.625(8) with carbon dioxide in his system — a result that even the majority finds to be insupportable. Further, the majority even highlights the scientific disagreement when it refers to the divergent definitions for “derivative” and states “that most of the above definitions of ‘derivative’ would encompass metabolites such as carbon dioxide. Not all of the above definitions, however, do so.” Ante at 327. Thus, it is false to suggest that this case is one in which the experts agree that ll-carboxy-THC is a derivative of marijuana and, therefore, a schedule 1 controlled substance.
*352 As it pertains to MCL 333.7212(l)(d), the Court of Appeals properly held that the statute was enacted to deal with substances that were produced synthetically. The statute refers to “synthetic equivalents” and “synthetic substances, derivatives, and their isomers with similar chemical structure or pharmacological activity... .” MCL 333.7212(l)(d). Synthetic substances are substances that were altered, sometimes in minor ways, but that can still have pharmacological effects on a person. However, 11-carboxy-THC is a metabolite; it is a natural substance that occurs when a person’s body breaks down THC, and it is not a synthetic substance. Therefore, 11-carboxy-THC is also not classified as a schedule 1 controlled substance by MCL 333.7212(l)(d). Moreover, in Hemp Industries Ass’n v Drug Enforcement Admin, 333 F3d 1082, 1089 (CA 9, 2003), the Ninth Circuit Court of Appeals interpreted a regulation with language similar to that used in MCL 333.7212(l)(d) and held that this regulation was enacted because THC was being produced synthetically and should be controlled. Likewise, the comparable statute at issue addresses substances produced synthetically and not those produced naturally through metabolism.
Finally, the Legislature knows how to use the term “metabolite” when it wants to. In MCL 722.623a, the Legislature specifically uses the term “metabolite” in discussing child abuse reporting requirements. The statute specifically refers to “a metabolite of a controlled substance.” The Legislature is presumed to be aware of all existing statutes when it enacts another. Walen v Dep’t of Corrections, 443 Mich 240, 248; 505 NW2d 519 (1993). The fact that the Legislature specifically chose not to include the word “metabolite” is further indication that 11-carboxy-THC should not be *353 classified as a schedule 1 controlled substance under the language selected by the Legislature.
Thus, the majority’s interpretation that 11-carboxy-THC is a schedule 1 controlled substance is flawed for numerous reasons. Namely, the interpretation ignores federal case law, the statutory language chosen by our Legislature, and other relevant statutory provisions, as well as the basic tenets of statutory construction. Notably, the majority’s unsupportable theory results in an interpretation that is not just analytically flawed but is also unconstitutional.
THE ISSUE WHETHER THE MAJORITY’S INTERPRETATION OF THE STATUTE IS UNCONSTITUTIONAL IS PROPERLY PRESERVED
The issue whether the majority’s interpretation of the statute is unconstitutional has been properly raised and preserved. Contrary to the majority’s assertion that the constitutional issue has not been properly preserved, defendant Derror did sufficiently raise this issue. Defendant Derror’s first question presented states, “IS CARBOXY THC, A METABOLITE OF MARIJUANA WITH NO PHARMACOLOGIC EFFECTS, A SCHEDULE 1 CONTROLLED SUBSTANCE?” One of the reasons that defendant Derror argues 11-carboxy-THC is not a schedule 1 controlled substance is that such an interpretation would be unconstitutional. This is explicitly expressed in one of the subheadings addressing this issue, which states, “The Definition Of Marijuana In MCL 333.7106 Does Not Include Carboxy THC. The Unprecedented Expansion Of This Definition, Originally Adopted By The U.S. Congress In 1937, Is Contrary To The Plain Language Of The Statute, Legislative Intent, And Renders The Statute Constitutionally Vague And Overbroad.”
*354 Further, defendant Derror’s second question presented states, “CAN MCL 257.625(4), (5) AND (8) BE INTERPRETED TO CREATE STRICT LIABILITY CRIMES WITHOUT VIOLATING DEFENDANTS’ CONSTITUTIONAL RIGHT TO DUE PROCESS?” In addressing this issue, defendant Derror further explains why classifying 11-carboxy-THC as a schedule 1 controlled substance would violate a person’s due process rights. Notably, the prosecutor in Derror responded to these arguments in his brief, specifically arguing that Michigan’s statute is constitutional because there is a legitimate state interest in proscribing the use of any amount of certain controlled substances. Not only was this issue briefed, but Chief Justice TAYLOR specifically questioned the parties about the constitutionality of the statute during oral argument, as did Justice YOUNG and Justice MARKMAN. Accordingly, the majority’s contention that I have strongly criticized the practice of raising issues that have never been argued or briefed by the parties is an accurate statement, but it is wholly inapplicable to this case. The parties not only had the opportunity to address the constitutional issue in this case, but they indeed did so. The majority misrepresents the record in this case and quotes from a prior opinion that I wrote to try and conjure up an inconsistency in my position when indeed no such inconsistency exists. The issue of constitutionality has been properly raised and preserved, and, as such, I find the majority’s interpretation of the statute to be unconstitutional.
THE MAJORITY’S INTERPRETATION OF THE STATUTE IS UNCONSTITUTIONAL
It is indisputable that due process requires that citizens “be apprised of conduct which a criminal statute prohibits.” People v Turmon, 417 Mich 638, 655; 340 *355 NW2d 620 (1983).[4] “The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.” United States v Harriss, 347 US 612, 617; 74 S Ct 808; 98 L Ed 989 (1954). No person “shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.” Id. For a criminal statute to be constitutional, it “must define the criminal offense ‘with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.’ ” People v Lino, 447 Mich 567, 575; 527 NW2d 434 (1994), quoting Kolender v Lawson, 461 US 352, 357; 103 S Ct 1855; 75 L Ed 2d 903 (1983). Moreover, if the general class of offenses affected by a statute “can be made constitutionally definite by a reasonable construction of the statute, [a court] is under a duty to give the statute that construction.” Harriss, supra at 618.[5]
The majority’s interpretation of the statute is unconstitutional for three reasons. First, the majority’s interpretation of the statute does not provide an ordinary *356 person with notice about what conduct is prohibited. MCL 257.625(8) prohibits driving with any amount of a schedule 1 controlled substance in a person’s body. However, the majority interprets the statute in such a way as to provide no guidance to an ordinary person about when he can legally drive given the scientific testimony that 11-carboxy-THC can easily be found in a person’s system for weeks after marijuana was ingested. This means that long after any possible impairment from ingesting marijuana has worn off, a person still cannot drive according to the majority’s version of the statute. It also means that whether a person is deemed to have any amount of 11-carboxy-THC in his system depends on whatever cutoff standard for detection is set by the laboratory doing the testing.[6] This lacks any sort of guidance to give a person fair notice of when he can legally drive a car. Further, as explained by Dr. McCoy, as tests become more sophisticated, scientists will ultimately be able to determine if a person ever actively or passively ingested marijuana. Under the majority’s theory, no one could legally drive a car if he ever inhaled marijuana. The majority states that it is “irrelevant” that a person cannot legally drive until long after any possible impairment from ingesting marijuana has worn off, even if this is weeks, months, or years. Further, the majority deems it “irrelevant” that a person cannot determine without clinical drug testing when 11-carboxy-THC can no longer be detected in a person’s system. The majority believes all this is constitutional, and a person is on notice that driving may be indefinitely prohibited because ingesting marijuana is a misdemeanor. MCL 333.7404. But the penalty for ingesting marijuana under MCL 333.7404(2)(d) is “im *357 prisonment for not more than 90 days or a fine of not more than $100.00, or both.” The penalty for violating this misdemeanor statute is not being prohibited from possibly ever driving a car again. Thus, there is nothing in MCL 333.7404 that serves to put a person on notice that ingesting marijuana may very well mean that he cannot drive indefinitely or even permanently.
The majority’s interpretation now criminalizes a broad range of conduct and makes criminals out of people who have no knowledge of the conduct that they must now seek to avoid. The majority’s interpretation even makes criminals out of people who have inhaled marijuana smoke merely through passive inhalation. Dr. Evans, who testified in a hearing regarding defendant Kurts and who has worked with numerous agencies, including the United States Drug Enforcement Administration, stated, “You can get up to levels of five, eight, or ten nannograms [sic] per mil of carboxy THC in the blood by passive inhalation.”[7] The prosecutor’s expert in the Derror case, Dr. Glinn, admitted that Dr. Marilyn Huestis is one of the top ejqperts on cannabis and its metabolites in the area of toxicology and chemistry. In an article written by Dr. Huestis, she states: “Environmental exposure to cannabis smoke can occur through passive inhalation of side-stream and exhaled smoke by non-users. Several research studies have indicated that it is possible to produce detectable concentrations of cannabinoid metabolites in the urine and plasma after passive inhalation of cannabis smoke.”
*358 Huestis, Cannabis (marijuana) — Effects on human behavior and performance, 14 Forensic Sci Rev 15, 32 (2002).
There is scientific evidence that 11-carboxy-THC can indeed get into a person’s body through passive inhalation. This is contrary to the majority’s assertion that 11-carboxy-THC is only present in a person’s body after they have “done something illegal.” Ante at 338. Scientific evidence of 11-carboxy-THC being present after passive inhalation means that a person who attends a concert or a gathering where someone is smoking marijuana and passively inhales this smoke will have 11-carboxy-THC in his body. With no standard in place to use as a cutoff, it does not matter what level of 11-carboxy-THC this inhalation results in because, under the majority’s interpretation of the statute, it is now illegal for that person and any person who has ever ingested marijuana to drive if 11-carboxy-THC can be detected. As the trial court in the Derror case correctly noted, under the majority’s theory, “as long as we can identify [ll-]carboxy-THC in [a person’s] system, apparently they can’t be on the highway and, as science progresses, that could be for years.”
While such an argument may at first seem farfetched, it is the logical result of the majority’s interpretation of the statute. The majority’s interpretation is only limited by the scientific testing used in a particular case. If a test can detect 11-carboxy-THC from marijuana that was ingested one year ago, ten years ago, or 20 years ago, it is now a crime to drive, according to the majority.
Because of the tremendous potential for arbitrary and discriminatory enforcement in charging Michigan citizens with a crime under the majority’s interpretation, the statute is unconstitutional for this second *359 reason as well. The United States Supreme Court has recognized that a critical aspect of the vagueness doctrine is “ ‘the requirement that a legislature establish minimal guidelines to govern law enforcement.’ ” Kolender, supra at 358, quoting Smith v Goguen, 415 US 566, 574; 94 S Ct 1242; 39 L Ed 2d 605 (1974). Otherwise, a criminal statute would permit enforcement on the basis of the whims of police officers and prosecutors.
The majority’s belief that it is a crime to operate a vehicle with any amount of 11-carboxy-THC in a person’s body means that a prosecutor can choose to charge a person found to have 0.01 nanograms of 11-carboxy-THC in his system if the prosecutor chooses. In the Kurts case, the trial court also discussed the possibility that a person could be charged weeks after ingesting marijuana, stating that “maybe you can test positive [for 11-carboxy-THC] three weeks later, but there isn’t any evidence that you could be under the influence of it.” The prosecutor responded that it was a question for the jury, but, “hopefully, our office wouldn’t even charge such a case.” But the reality is that under the majority’s interpretation of the statute, a prosecutor could charge in that case and many others because of the majority’s improper interpretation of the statute, leaving Michigan citizens unsure of what conduct will be deemed criminal.[8]
*360 Third, and finally, the majority’s interpretation of the statute is unconstitutional because it is not rationally related to the objective of the statute. See Harvey v Michigan, 469 Mich 1, 7; 664 NW2d 767 (2003). For a statute to be deemed unconstitutional under rational-basis review, it must be shown that the legislation is “arbitrary and wholly unrelated in a rational way to the objective of the statute.” Smith v Employment Security Comm, 410 Mich 231, 271; 301 NW2d 285 (1981).
Simply put, the statute at issue seeks to prevent a person from operating a vehicle while under the influence of drugs. But 11-carboxy-THC has no pharmacological effect on a person, and therefore cannot affect a person’s driving. While 11-carboxy-THC does indicate that a person had THC in his system at some point in the past, there is no indication of when the THC was in the person’s system. Dr. Glinn admitted that the levels of 11-carboxy-THC do not indicate whether the effects of the parent drug — marijuana—are still present. She stated, “You can’t correlate the levels with the effects very well.” Further, no expert testified that a person who had ingested marijuana days and weeks ago would still be impaired. To the contrary, Dr. Glinn testified that the effects may be seen “up to 24 hours ....” The scientific evidence is irrefutable that 11-carboxy-THC stays in a person’s system far past the point of any impairment. There is simply no rational reason to charge a person with 11-carboxy-THC in his system weeks after marijuana was originally ingested when a person can no longer be impaired from the effects of the marijuana.
Plainly, there is no rational reason to charge a person who passively inhaled marijuana smoke at a rock concert a month ago and who now decides to drive to work. There is no rational reason to charge a person who *361 inhaled marijuana two weeks ago and who now decides to drive to the store to pick up a gallon of milk. While I certainly agree with the Legislature’s position that a person should be punished for driving while under the influence of a controlled substance because of the potential for tragic outcomes, the majority’s interpretation of the statute is arbitrary and wholly unrelated in a rational way to the objective of the statute. To say that driving while a person’s system contains any amount of a substance that has no pharmacological effect is a crime — given that under the most conservative estimates offered by the prosecution, the current scientific testing can find evidence of the substance for at least four weeks — is not permissible under the Constitution. It is this Court’s role to construe statutes to avoid a danger of unconstitutionality, see Harriss, supra at 618, yet today the majority has ignored this longstanding principle. A reasonable construction of the statutory language is possible — for example, finding that 11-carboxy-THC may be used as circumstantial evidence of a statutory violation — yet the majority has chosen a position that is contrary to the Constitution and the rights of our citizens.
CONCLUSION
Because the majority interprets the statutory provisions at issue contrary to the express wording chosen by the Legislature, as well as contrary to the intent of the Legislature, I must respectfully dissent. Today’s holding now makes criminals of numerous Michigan citizens who, before today, were considered law-abiding, productive members of our communities. Now, if a person has ever actively or passively ingested marijuana and drives, he drives not knowing if he is breaking the law, because if any amount of 11-carboxy-THC can be *362 detected — no matter when it was previously ingested — he is committing a crime. The majority’s interpretation, which has no rational relationship to the Legislature’s genuine concerns about operating a vehicle while impaired, violates the United States Constitution and the Michigan Constitution. Therefore, I would affirm the decision of the Court of Appeals.
Weaver and Kelly, JJ., concurred with Cavanagh, J.

 The federal statute states:
The term “marihuana” means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such term does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination. [21 USC 802(16).]

 The majority consulted medical dictionaries. A further review of various chemical dictionaries indicates exactly what the majority has stated — there are widely divergent definitions of “derivative” and “metabolite,” such that a definition alone cannot resolve this issue. See, e.g., Grant & Hackh’s Chemical Dictionary (5th ed); Glossary of Chemical Terms (2d ed); Hawley’s Condensed Chemical Dictionary (12th ed).

 I note that the majority attempts to create an inconsistency in my position when none actually exists. Ante at 328-329 n 7. The majority references a prior case that I wrote—Stanton v Battle Creek, 466 Mich 611; 647 NW2d 508 (2002)—and states that I used the same principles that I criticize the majority for using in this case. However, the majority should read my opinion in Stanton more closely. In Stanton, I recognized that there were divergent definitions of the term “motor vehicle” and that one should be selected that most closely effectuates the Legislature’s intent. I further stated, “Fortunately, our jurisprudence under the governmental tort liability act provides an answer regarding which definition should be selected.” Id. at 618 (emphasis added). In direct contrast to my analysis in Stanton, the majority has not used jurisprudence to guide its decision; instead, those in the majority have solely used their personal beliefs about what the outcome of this case should be to guide their decision. As such, the majority has ignored the rules of statutory construction in its effort to arrive at its desired result.

 The Fifth Amendment of the United States Constitution provides in relevant part:
No person shall... be deprived of life, liberty, or property, without due process of law .... [US Const, Am V]
The Michigan Constitution provides in relevant part:
No person shall be .. . deprived of life, liberty or property, without due process of law. [Const 1963, art 1, § 17.]

 I note that the majority does not refer to this rule of law, instead only stating that a statute will not be struck down as vague even though doubtful cases can he imagined. See ante at 337. The majority’s choice to ignore its mandate to reasonably construe a statute to ensure that it is constitutional is central for it to reach its decision today.

 For example, cutoff standards have been reported at 100, 50, 20, and 5 nanograms. Huestis, Cannabis (marijuana) — Effects on human behavior and performance, 14 Forensic Sci Rev 15, 26-27 (2002).

 The prosecutor in the Kurts case argued to the contrary at oral argument and cited an article that he stated supported his position. While this article was never admitted into the record, a review of the article indicates that it does not stand for the blanket proposition that the prosecutor argued.

 Unlike the prosecutor in the Kurts case, the prosecutor in the Derror case noted that a charge was a very real possibility, as indicated by the following exchange during a hearing. The trial court stated to the prosecutor, “[I]t seems like what you are saying now is that it’s your position that we could assume hypothetically that the consumption of this marijuana had absolutely no effect, whatsoever, on this lady’s driving, but the penalty should still be enhanced from two to 15 years.” The prosecutor replied, “That is the position of the People, Your Honor ....”